### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE MEDIA COMPANY, *et al.*, | Case No. 08-13141 (BLS) |
| Debtors. | Re: Docket Nos. 3796, 11792 |

### OPINION[1]

## I.  INTRODUCTION

Herman Melville's *Moby Dick* is often held up as the greatest American novel. Grueling and esoteric, it follows a crew of sailors striking out on the seas, resisting illness and starvation to mete out a living in the dramatic backdrop of an untamed and hostile wilderness. At its center is the enigmatic Captain Ahab. Famously, Ahab leads his crew on an obsessive pursuit of an unnamed evil, embodied in a white whale, with the hope to ultimately "wreak [his] hate" upon the animal. Depending on the interpretation of the reader, Melville's account of Ahab could be seen as an exultation or an indictment of an individual's single-mindedness.

Mr. Robert Henke is not Captain Ahab. He was, however, the subject of an article that appeared in the Baltimore Sun newspaper[2] in 2007 entitled "A Modern-Day Ahab – In pursuit of geologic immortality, inventor Robert Henke has sacrificed

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this claim objection pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

[2] Referred to, sometimes, herein as the "Sun."

everything: comfort, career, family."[3]  Believing the article had caused him harm, Mr.

Henke filed a defamation lawsuit against the Baltimore Sun in Maryland state court

seeking $100 million in damages.[4]

Tribune Company and its affiliates, including the Baltimore Sun, (collectively,

the "Debtors") filed Chapter 11 petitions on December 8, 2008. Mr. Henke filed two

claims against the Debtors based on the state court defamation complaint.[5]  The

Debtors objected to Mr. Henke's claims.[6]  Following a hearing before the Honorable

Kevin J. Carey, the Court sustained the Debtors' objection to Mr. Henke's claims and

the claims were disallowed.[7]

Mr. Henke appealed that decision to the United States District Court for the

District of Delaware. On February 15, 2019, the District Court ruled that Mr. Henke,

who represented himself *pro se*, did not receive adequate notice that his hearing

before Judge Carey was an evidentiary hearing on the merits and "was not afforded

a fair chance to submit evidence to support his claim."[8]  Therefore, the District Court

---

[3] Henke Ex. 1.

[4] *See* Docket No. 3796, attaching Mr. Henke's original proof of claim.

[5] On June 8, 2009, Mr. Henke filed proof of claim number 3697 against the Baltimore Sun in the amount of $100 million.  On April 19, 2012, Mr. Henke filed amended proof of claim number 7106, attaching an amended state court complaint dated April 15, 2012 (the "AC").

[6] The Debtors filed an objection to claim number 3697.  (Docket No. 3796). On June 11, 2012, after Mr. Henke filed the amended claim, the Debtors filed a Supplemental Objection to Claims of Robert Henke (Docket No. 11792).  Mr. Henke filed responses to both objections.  (Docket Nos. 3989, 11931). The Debtors filed a reply in support of the supplemental objection to claim, and Mr. Henke filed a sur-reply. (Docket Nos. 11956, 12238). The Debtors' original objection, supplemental objection and reply shall be referred to herein as the "Claim Objection."

[7] *In re Tribune Media Co.*, 552 B.R. 282 (Bankr. D. Del. 2016) *vacated and remanded Henke v. Tribune Media Co.*, Civ. A. No. 1:16-cv-00424-RGA slip op. (D. Del. Feb. 15, 2019).

[8] Docket No. 14505.

vacated the Bankruptcy Court order sustaining the Debtors' objection to Mr. Henke's claims and remanded the matter to the Bankruptcy Court.[9]

After remand, the Bankruptcy Court held a status conference on the Claim Objection.[10]  On May 7, 2019, the Court approved a stipulated discovery schedule signed on May 2, 2019 by Mr. Henke and counsel for the Debtors.[11]  The Scheduling Order provided that Mr. Henke could prepare and serve discovery requests (including requests for production of documents, requests for admissions, or interrogatories), and the Baltimore Sun would respond to those requests no later than 18 days after receipt.[12]  The Scheduling Order also set June 20, 2019 as the date for the new evidentiary hearing on the Claim Objection.[13]

On May 14, 2019, Mr. Henke filed a document seeking, in part, to extend discovery deadlines.[14]  On May 23, 2019, the Court held an initial status conference to discuss, among other things, Mr. Henke's request. At the status conference, Mr. Henke confirmed that he sent discovery requests to the Debtors and was awaiting answers.[15]  The Court advised Mr. Henke that he should be prepared to submit "evidence in support of [his] claims . . . any documents and any information and

---

[9] Docket No. 14505. The Chapter 11 bankruptcy case of Tribune Media Company and its affiliates was originally assigned to Judge Kevin J. Carey. For administrative reasons regarding the announced retirement of Judge Carey, the case was reassigned to me on May 13, 2019.  Docket No. 14525.

[10] *See* Docket Nos. 14510, 14517, and 14520.

[11] Docket No. 14523 (the "Scheduling Order").

[12] Docket No. 14523, Ex. A.

[13] *Id.*

[14] Docket No. 14526. Mr. Henke's filing contained two motions: a motion to recuse Judge Carey and a "motion regarding conduct of debtors' attorneys," which sought to extend the discovery deadlines. At the May 23, 2019 status conference, the Court noted that the motion to recuse was not granted, but that administrative reassignment of the Tribune bankruptcy case occurred prior to Mr. Henke's filing of the motion. Docket No. 14535, Tr. 5/23/2019 at 4:16 – 5:4. Accordingly, Mr. Henke's motion to recuse was denied as moot. *Id.*

[15] Tr. 5/23/2019 at 10:19 – 12:3; 13:16 – 15:3.

materials" at the June 20, 2019 evidentiary hearing.[16]  The Court further advised Mr. Henke that he should arrange for any witnesses who may have relevant testimony to appear at the hearing.[17]  The Court directed the parties to confer regarding documents to be submitted at the evidentiary hearing and the filing of any pretrial statements so that neither side would be surprised.[18]  The Court set a further status conference for June 17, 2019 (after Mr. Henke should have received responses to the discovery requests, but before the evidentiary hearing), to determine whether there was a basis for adjourning the June 20, 2019 hearing date.[19]

The Court held two further status conferences on the Claim Objection to ensure that any pre-trial discovery disputes were resolved and to ensure that the parties had adequate time to prepare to present evidence at the hearing.[20] The Court agreed to move the evidentiary hearing to from June 20, 2019 to July 2, 2019.  On June 27, 2019, Mr. Henke sent a document entitled "Evidence for evidentiary hearing of July 2, 2019"[21] to the Debtors.  The Debtors filed an Agenda with the Court prior to the evidentiary hearing which included a copy of the Henke Evidence Document.[22]

On July 2, 2019, the Court held an evidentiary hearing on the Claim Objection. The Debtors called one witness: the author of the article, Mr. Gadi Dechter, who testified credibly and at length. Mr. Henke declined to cross-examine Mr. Dechter

---

[16] *Id*. at 22:2 – 22:11.
[17] *Id*.
[18] *Id*. at 23:5 – 25:17.
[19] Tr. 5/23/2019 at 15:25 – 18:12.
[20] One pretrial status conference was held on June 17, 2019 (Docket Nos. 14546, 14548) and one was held on June 27, 2019 (Docket No. 14554).
[21] Hereinafter, the "Henke Evidence Document."
[22] Docket No. 14563, attachment (p).

and he did not call any witnesses of his own.[23] Mr. Henke did, however, submit boxes of documents into evidence.[24] On August 5, 2019, the parties gave their closing arguments on the Claim Objection via teleconference.[25] This matter is now ripe for disposition.

For the reasons that follow, the Court will sustain the Reorganized Debtors' Claim Objection and disallow Mr. Henke's claims.

## II.    FACTUAL BACKGROUND

Mr. Henke and his wife, through their small firm called Dynamic In Situ Geotechnical Testing, spent years developing a new earthquake engineering geotechnical (soil) testing technology (the "Technology"), and bringing the Technology into practice.[26] The Technology was described as:

> intended solely to advance the ability to engineer critical constructed facilities (for instance, highway bridges, hospitals, schools, and power plants) to resist earthquakes. The test provides, for soil deposits that may support such facilities, information on soil deformation characteristics that can greatly affect how facilities behave during earthquakes. Such information is needed in earthquake engineering to predict, for example, the motions of constructed facilities.[27]

---

[23] Mr. Henke repeatedly has alleged that he "no longer [has] the resources to draw on witnesses, to be able to depose them or anything like that, whereas, I did for the 2012 hearing." Tr. 6/27/2019 at 11:12 – 11:15. Unfortunately, the Court has no remedy for Mr. Henke's alleged lack of financial resources. The Court notes, however, that Mr. Henke declined to call himself or his wife, who was also present at the evidentiary hearing, as witnesses.

[24] The Court notes that Mr. Henke's evidentiary submissions include original newspaper clippings from the Baltimore Sun dating back to 1990, as well as handwritten personal diaries and journals, workpapers, books and other materials (the "Henke Evidentiary Materials"). Mr. Henke gave the Court original copies of the Henke Evidentiary Materials but did not provide copies to the Debtors. In addition, Mr. Henke gave the Court separate typed documents that contain excerpts from his diaries and a summary of the newspaper articles. The Debtors objected to these submissions solely on relevance grounds. The Court overrules the Debtors' objection and relies on Mr. Henke's summaries.

[25] Docket Nos. 14578, 14579.

[26] Henke Evidence Document, ¶ 2.

[27] Henke Ex. 2, attachment labeled "Document #1," entitled "Summary of Selected Experiences of Dynamic In Situ Geotechnical Testing with Emphasis on Academic Issues" dated August 2006, revised November 2006 (the "Nov. 2006 Summary) at 2.

Mr. Henke and his wife, however, faced numerous hurdles in completing their research and development of the Technology. In 2006, Mr. Henke was pressing various sources for an investigation of "three decades of official and professional misconduct" that prevented the advancement of the Technology and drove Mr. Henke, his wife and their firm to a state of ruin.[28]  Mr. Henke alleged that the misconduct included "the possibilities of the manipulation of grant competitions, theft from proposals, retaliation and a breakdown in safeguards."[29]

Mr. Henke alleges that the campaign to thwart the advancement of the Technology began with his time on the faculty at Johns Hopkins University (the "University") between 1985 and 1989.[30]  He alleges that the University became hostile and retaliated against him for his actions as an academic "whistleblower" when he charged students with plagiarism and was unwilling to engage in grade inflation.[31]

After leaving his position at the University, Mr. Henke devoted his full efforts to his firm and the Technology.  Mr. Henke avers that he, his wife and the firm made "remarkable progress" with the Technology, paid for through government and private support, as well as their own significant personal investment.[32]  Such progress included designing and constructing three costly prototype systems, laboratory

---

[28] Henke Evidence Document, ¶4.
[29] Henke Ex. 2, attachment Letter dated November 30, 2006 to Mr. Raymond A. Mason, p. 1.
[30] Henke Evidence Document, ¶ 5.
[31] *Id.* at ¶¶ 4, 5, 38a – 38h, Henke Ex. 8 (marked confidential).
[32] Nov. 2006 Summary, at 3-4.

testing, field tests, and publishing their work in a series of articles in a leading international journal on earthquake matters.[33]

However, as Mr. Henke submitted funding proposals to governmental agencies, including the National Science Foundation (the "NSF"), he grew concerned that the process was being "manipulated to insure the failures of our proposals."[34] He alleges that his proposals were "being treated improperly," for example, being placed in inappropriate competitions or receiving comments by reviewers that were "technically absurd."[35]  Suspecting bias, Mr. and Ms. Henke sued the NSF and the National Institute of Standards and Technology ("NIST") in the early 1990's for refusing to reveal the names of the peer reviewers who examined their proposals.[36] Ultimately, the lawsuits were unsuccessful.[37]

Mr. Henke also became concerned about the possibility of theft of ideas from his proposals and he requested that the Office of the NSF's Inspector General investigate the matter.[38]  The investigation took place over 2½ years, but the investigator wrote in a letter dated April 1, 1996 that there was "insufficient substance to support further inquiry."[39]  Mr. Henke questioned the results of the

---

[33] *Id.*
[34] Nov. 2006 Summary, at 4 – 6.
[35] *Id.* at 5.
[36] Henke Ex. 5.
[37] Henke Ex. 1, ¶ 66.  ("Ultimately a federal judge in Washington ruled against the Henkes in their suit against the NSF.  In May 1994, the same judge ruled in their favor on the NIST case, ordering the agency to open its files, but that judgment was overturned on appeal.")
[38] Nov. 2006 Summary, at 7
[39] *Id.*

investigation, and a second investigator was assigned to review the inquiry. Around August 23, 2000, the second inquiry ended without satisfaction to Mr. Henke.[40]

Mr. Henke also found it suspicious when his long-standing relationship with the Federal Highway Administration dissolved in May 2001 under "highly irregular circumstances."[41] Similar questions arose when his firm's "good faith collaborative arrangement" with a Japanese research institute fell apart.[42]

In 2006, Mr. Henke wrote letters seeking investigations into the perceived irregularities he faced in obtaining government funding for his research. He wrote to a United States senator who, at the time, was the "ranking member of the committee charged with oversight of the Offices of the Inspectors General," and to the Chair of the University's Board of Trustees.[43]

On November 30, 2006, Mr. Henke also sent a letter to the Baltimore Sun enclosing detailed information to support his concerns.[44] Not only did he believe the Sun could "shed light on the *campaign*,"[45] he also believed the Sun's "possibly pivotal complicity in it."[46] Mr. Henke explains:

> Starting soon after the claimant left the *University*, *The Sun*, over roughly two decades (1990-2009), conspicuously published a large number of articles that suggest the possibility *The Sun* may have stalked him, the firm, and his family; interfered with progress on the *technology*; and protected possible architects of the *campaign*. . . . For example, the stalking articles publicized, in separate articles, a large

---

[40] *Id.* at 7-8.
[41] Nov. 2006 Summary, at 9.
[42] *Id.*
[43] Henke Ex. 2 (attachments).
[44] Henke Ex. 2; Debtor Ex. 44.
[45] Henke Evidence Document, ¶ 12. Mr. Henke defines the "*campaign*" as "a retaliatory alliance of possible officials and professionals that targeted claimant and Ms. Henke in an academia-seated whistleblower matter." *Id.* at Section II.
[46] *Id.* at ¶ 12.

number of claimant's students in a particular course of his; close friends and associates of his sons, and consultants and contractors of the *firm*.  Among other things, the articles gave him the unsettling sense that a top-tier newspaper was hovering over him, his family and the *firm*; wanted him to know that; and wanted him to know that it could strike at any time it wished.  Facts and reason suggest the *University* inspired the articles; the *University* is close to *The Sun* . . . and the initial articles coincided roughly with claimant's leaving the *University* and publicized students of his.  Truly bizarre matter that had a profound and permanent effect on his state of mind: moved him to save roughly two decades of article clippings and afflicted him with an irreversible and outsized sense of paranoia.[47]

Mr. Henke thought contacting the Sun would allow him to obtain information regarding the past Sun articles, including who had suggested writing the articles.[48] An editor at the Sun brought Mr. Henke's letter to Gadi Dechter, a full-time reporter at the Sun whose duties included reporting on matters involving higher education.[49] Mr. Dechter looked into the matter because the letter included "accusations . . . that the Sun was involved in some kind of wrongdoing . . . or that articles published by the Sun previously about Mr. Henke were problematic . . . [a]nd that there was some connection to Johns Hopkins University."[50]  Mr. Dechter talked to Mr. Henke and "found him to be an very interesting person who was articulate and had an extraordinary story to tell."[51]  Mr. Dechter felt his area of study - - "earthquake science" - - was something people had not heard about before; "the stakes were high, the promise was great, . . . and the facts of his life were very dramatic."[52]

---

[47] Henke Evidence Document, ¶ 12 (emphasis in original). *See also Id.* at ¶¶ 18a – 18g; Henke Ex. 3.
[48] Henke Evidence Document, ¶ 6.
[49] Tr. 7/2/2019 at 35:23 – 36:17; 42:15 – 43:10 (Dechter).
[50] *Id.* at 43:23 – 44:13 (Dechter).
[51] *Id.* at 44:14-20 (Dechter).
[52] *Id.* at 45:17 – 46:12 (Dechter).

When the Sun expressed an interest in writing an article about Mr. Henke's experiences in developing the Technology, Mr. Henke agreed because he "felt a sincere article might well lead to the investigation he had long sought."[53]

The article was a substantial nine-month long effort.[54]  Mr. Henke provided the Sun with additional documents and a set of slides about the history of the Technology.[55]  Mr. Dechter interviewed Mr. Henke over the telephone and spent four days interviewing Mr. Henke and his family in person in North Carolina.[56]  Mr. Dechter testified that he takes detailed notes during his interviews, as well as sometimes making an audio recording of the interview which may either be transcribed or used as backup.[57]  Mr. Dechter also interviewed people at the University who were familiar with Mr. Henke's time there and the reasons that his contract was not renewed.[58]  Mr. Dechter also interviewed previous co-workers or other people in the field who could discuss Mr. Henke's character or provide independent validation of the Technology's promise.[59]

On October 7, 2007, the Sun published the article in its Sunday edition (the "Article").[60]  The Article begins by lauding the Technology (or sometimes, the "Device") and its potential. It states:

---

[53] Henke Evidence Document, ¶ 6.
[54] *Id.* at ¶ 14.
[55] *Id.* at ¶ 14; Henke Ex. 14.
[56] *Id.* at ¶ 14.
[57] Tr. 7/2/2019 at 54:6 – 55:9 (Dechter); Debtor Ex. 1 – 6.
[58] Tr. 7/2/2019 at 70:5 – 71:17; 83:22 – 84:22 (Dechter).
[59] *Id.* at 78:5 – 81:7; 84:23 – 87:9; 87:20 – 88:6. (Dechter).
[60] Henke Ex. 1.

> The product of more than $2 million and 25 years of development, the
> device might just be the holy grail of earthquake engineering: a probe
> that can accurately predict the way various soils will react in a major
> quake. It could prevent building collapses and save lives. If it works. On
> that score, the geotechnical jury is still out . . . .[61]

The Article then remarks on American culture, which "valorizes the uncompromising

dreamers" and celebrates individuals who are "single-minded in their pursuit of

greatness . . . ."[62]  It categorizes Mr. Henke as one of those dreamers and observes:

> Robert Henke's monastic life is a testament to that ideal, but he is also,
> as a former boss says, a "captain Ahab of our generation," willing to
> wreck everything—including his family—chasing a dream that has
> become an obsession.[63]

The Article punctuates this description with details from Mr. Henke's personal life,

including his daily exercise routine, his parenting style, and his marriage. It states:

> His seven-mile jogging route is not picturesque, but then, Henke runs
> for principle, not pleasure. "I'm not an exercise enthusiast," he says. "It
> makes me feel sick." But to abandon the morning routine at this point
> would carry too much symbolic significance for a man whose main
> accomplishment has been his refusal to quit.[64]

> Concerned the boys would grow up shiftless, Henke forced them to wake
> early each day and submit to a grueling exercise regimen of running, sit-
> ups, push-ups and pull-ups.[65]

> By Henke's accounting, the probe has cost him $1 million in personal
> investment and an aborted academic career that began promisingly at
> Hopkins in 1985 and ended five years later. In 2002, he lost his
> Lutherville home. His wife and research partner, Wanda, left him soon
> afterward.[66]

---

[61] *Id.* at ¶¶ 4-5.
[62] *Id.* at ¶7.
[63] *Id.*
[64] *Id.* at ¶¶ 17-18.
[65] *Id.* at ¶ 72.
[66] Henke Ex. 1 at ¶ 9.

The Article repeatedly emphasizes the tension between Mr. Henke's devotion to his family and his desire to continue working on the Device. In its discussion of Mr. Henke's departure from the University and his choice to dedicate himself full-time to the Device, it says:

> Just like Columbus at the point of no return, Henke chose to stay the course, despite the risk to his own crew, his family. "In many ways, I think I was irresponsible." But, he points out, "Columbus came out a winner."[67]

The Article also recounts Mr. Henke's adolescence, meeting Ms. Henke, and the impact of his work on his family.  The Article notes that Mr. Henke had recently gone on a job interview and was open to finding employment so long as the opportunity "meet[s] his requirements."[68]  It discusses the lesson Mr. Henke has learned from his experience:

> Play the system.  Do what you're told. Be average. . . . Be careful when you strive for high goals. . . . Diversify in life so if you do lose on one count, you haven't lost it all. . . . I wish I could come up with something more uplifting.[69]

On October 3, 2008, Mr. Henke filed a complaint in state court against the Sun seeking $100 million in damages based on claims of defamation and misrepresentation.[70]  The bankruptcy petitions filed by Tribune Company and the Sun (and other affiliates) on December 8, 2008 stayed Mr. Henke's lawsuit. Mr. Henke filed a proof of claim and, later, an amended proof of claim against the Debtors based on his state court lawsuit.  The Debtors objected to Mr. Henke's claims.  Judge

---

[67] *Id.* at ¶ 55.
[68] *Id.* at ¶¶ 146-148.
[69] Henke Ex. 1, ¶¶ 127- 128.
[70] Docket No. 3797, Exhibit A.

Carey held a hearing on the Debtors' objection and in 2016 issued an Opinion and Order sustaining the Debtors' objection and disallowing Mr. Henke's claims.[71] Mr. Henke appealed that decision and the District Court vacated the Opinion and Order and remanded the matter to this Court for trial.[72]

## III.  STANDARD

The Debtors object to Mr. Henke's claim under 11 U.S.C. § 502(b)(1), which provides that a court will disallow a claim to the extent it is unenforceable under applicable law. Mr. Henke, therefore, will be entitled to payment only if he has a valid claim under the laws of Maryland.[73]

The burden of proof for a claim filed in a bankruptcy proceeding "rests on different parties at different times."[74] Initially, the claim holder must establish the prima facie validity of the claim.[75] The claim objector must then produce evidence that, "if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."[76] At that point, the burden shifts back to the claim holder to prove the validity of the claim by a preponderance of the evidence.[77] The ultimate burden of persuasion rests on the claimholder. Mr. Henke, as claim holder, met his

---

[71] *In re Tribune Media Co.*, 552 B.R. 282 (Bankr. D. Del. 2016) *vacated and remanded Henke v. Tribune Media Co.*, Civ. A. No. 1:16-cv-00424-RGA slip op. (D. Del. Feb. 15, 2019).

[72] Docket No. 14505.

[73] *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 245 n. 66 (3d Cir.2004). ("To determine whether claims are enforceable for bankruptcy purposes, § 502 relies upon applicable non-bankruptcy law. . . . Ultimately, the effect of § 502 is to provide a bankruptcy trustee with the same rights and defenses to claims as held by the debtor prior to bankruptcy." (internal punctuation and citations omitted)).

[74] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

[75] *Id.* ("[T]he claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is *"prima facie"* valid.").

[76] *Id.*

[77] *Id.* at 174.

initial burden when he filed his proof of claim. But the Debtors have adequately rebutted the validity of his claim in the Claim Objection.[78]   The burden now shifts back to the claimant, and Mr. Henke must prove his defamation claim by a preponderance of the evidence.

## IV.    THE PARTIES' POSITIONS

Mr. Henke alleges claims of defamation and misrepresentation against the Sun. He argues the Article contains statements that are defamatory, falsehoods, or omit crucial facts.    Mr. Henke also alleges that the Sun made numerous misrepresentations which induced him to agree to the Article. At trial, Mr. Henke also alleged that the Sun stalked him and published articles that contained messages meant to intimidate him and his family.

In reply, the Debtors argue that Mr. Henke has not fulfilled any of the elements for defamation, much less all of them. They also argue that the Sun did not make any misrepresentations to Mr. Henke and that other articles which Mr. Henke purported as showing stalking or intimidation of him or his family were simply coincidences.

---

[78] Docket Nos. 3796, 11792, 11956, and 14556.  "In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Allegheny*, 954 F.2d at 173-74.

V.    ANALYSIS

A. **Defamation**

Mr. Henke separated his eleven defamation claims into four categories:

| Category | Count | Disputed Content |
|---|---|---|
| I. Theme | 1. Defamation through Theme | Mr. Henke posits that the overall tone and theme of the Article suggest he is reckless, eccentric, and obsessed |
| II. Material Concealments | 2. Falsification of Tenure at the University | The Article omits Mr. Henke's plagiarism accusations |
| | 3. Concealment of Possibility of Retaliation | The Article does not discuss the Henkes' belief that federal agencies were biased, and that the University had sabotaged their professional relationships |
| III. Personal Attacks | 4. Falsification of Air Force Discharge | The Article states Henke withdrew from the air force through a self-initiated elimination |
| | 5. Defamation Regarding Profanity | The Article contains a quote in which Henke's son—quoting his father—uses profanity[79] |
| | 6. Falsification of Parenting | The Article states that Mr. Henke did not permit his sons to watch movies and TV and restricted the types of books they read; Article states he would let his family suffer for the Device |

---

[79] Mr. Henke does not dispute the accuracy of the quote as made by his son. Rather, he argues that his son misquoted him. Mr. Henke argues he would never use profanity.

| IV. Falsification Regarding Technology | 7. Falsification of Promise of Technology | The Article omits field test results and a report from 1986 that suggested the Device had promise; it also states that Henke's main accomplishment has been his refusal to quit |
| | 8. Falsification of Sincerity of Undertaking | The Article states that following a major earthquake in 1989, the Henkes' believed the Device would be in high demand[80] |
| | 9. Falsification of Professionalism | The Article states that soil testing devices are complex and are generally not suited to being developed in a residential basement |
| | 10. Falsification of Japanese Collaboration | The Article omits details about the Henkes' collaboration with the Geo-Research Institute of Japan |
| | 11. Falsification of Risk of Undertaking | The Article incorrectly implies that Mr. Henke proceeded with a substantially risky venture, thereby knowingly endangering his family. |

Under Maryland law, Mr. Henke must prove four elements to establish a defamation claim: (1) the Sun made a defamatory statement to a third person, (2) the statement was false, (3) the Sun was legally at fault in making the statement, and (4) Mr. Henke thereby suffered harm.[81] The standard of fault that the Court must apply to a defamation claim varies depending on whether the plaintiff (here, Mr.

---

[80] Mr. Henke does not dispute that there was a major earthquake that made the Device particularly relevant. He asserts that the Article implies that he wanted to profit off a disaster.

[81] *Norman v. Borison*, 418 Md. 630, 645 n.10, 17 A.3d 697, 705 (Md. 2011) (quoting *Offen v. Brenner*, 402 Md. 191, 198-99, 935 A.2d 719, 723-24 (Md. 2007)).

Henke) is a public figure or a private individual. If a plaintiff is a public figure, then he must meet a higher standard of fault and show that the defendant published the defamatory statement with "actual malice."[82] Otherwise, the plaintiff only needs to show that the defendant negligently made the defamatory statements.

The Debtors argue that Mr. Henke should be considered a limited purpose public figure.[83] Courts have recognized this subset of public figures to include individuals who, "although they are not well known throughout the country or on every issue, are nonetheless sufficiently involved in one particular arena to qualify as public figures for that purpose."[84] The Third Circuit relies on a two-part inquiry to determine whether someone is a limited purpose public figure: "(1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of the plaintiff's involvement in that controversy."[85]

The Debtors claim that the Mr. Henke has "long sought to influence the resolution of the controversies discussed in the Article," which controversies include "official and professional" efforts to thwart the development of his Technology and the broader problem of corruption in the federal grant reviewing process.[86] The Debtors assert that Mr. Henke became involved in these controversies voluntarily by filing lawsuits against agencies that denied his grant applications (which were reported in multiple press outlets at the time), and approaching the Sun, hoping that

---

[82] *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).
[83] D.I. 14556 ("Debtors' Supp. Mem.").
[84] *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1077 (3d Cir. 1988).
[85] *McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3d Cir. 1985) (citations omitted).
[86] Debtors' Supp. Mem. at 10-11.

the newspaper would investigate the misconduct that, he claims, led to his professional difficulties.[87]  The Debtors point out that, in addition to contacting the Sun, Mr. Henke contacted the Office of the National Science Foundation's Inspector General, the University, and selected politicians in hopes of starting an investigation.[88] The Debtors contend that affirmatively seeking media attention "is a quintessential indicator of public figure status" [89] and argue that he is a limited purpose public figure in connection with the controversies raised in the Article.

If Mr. Henke is a limited purpose public figure, then he must prove that the Article published false statements about him with "actual malice," that is, with knowledge that the statements are false or with reckless disregard of whether  they are false or not.[90]  If Mr. Henke is not a limited purpose public figure, he need only prove that the Sun acted negligently in publishing the false statements.[91] The Court declines to decide this issue.  Even if the more lenient negligence standard is applied in this case, Mr. Henke has not proven his defamation claims.

1. *Defamatory Statements Made to a Third Person that are False*

A defamatory statement is one which "tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from

---

[87] *Id.* at 11-12.

[88] *Id.* at 12.

[89] *Id.* (citing *Wells v. Liddy*, 186 F.3d 505, 537 (4th Cir. 1999) (noting the distinction between one who simply responds to a press request for information and one who actively seeks out the press).

[90] *Schiavone*, 847 F.2d at 1076 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726, 11 L.Ed.2d 686 (1964)).  *See also Schiavone*, 847 F.2d at 1076-1079.

[91] *Watkins v. Washington Post*, Case No. PWG-17-818, 2018 WL 805394, *4 n. 5 (D. Md. Feb. 9, 2018); *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 596-97, 350 A.2d 688 (Md. 1976) *overruled on other grounds by Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 651, 709 A.2d 1222, 1225 (Md. 1998).

having a good opinion of, or associating with, that person."[92]   "To determine whether a publication is defamatory, a question of law for the court, the publication must be read as a whole:  '[W]ords have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed.'"[93]

"[A] 'false' statement is one 'that is not substantially correct.'"[94]   "The plaintiff carries the burden to prove falsity."[95]

### a. *Theme*

The first category of Mr. Henke's defamation claim is based on the Article's theme.  He argues that the "prominent theme of the article represents claimant as a delusional, unaccomplished eccentric who willingly destroyed his family in a reckless quest for scientific glory."[96]   Mr. Henke argues the Article's tone and theme imply that he is unprofessional.   He asserts the theme is reinforced through bold-face headings and various statements scattered throughout the Article, including:

> In pursuit of geologic immortality, inventor Robert Henke has sacrificed everything: comfort, career, family.[97]

> Obsession comes at a high cost.[98]

---

[92] *Norman,* 418 Md. at 645 n.10.
[93] *Piscatelli v. Van Smith*, 424 Md. 294, 306, 35 A.3d 1140, 1147 (Md. 2012) (quoting *Chesapeake Publ'g Corp. v. Williams*, 339 Md. 285, 295, 661 A.2d 1169, 1174 (Md. 1995)).
[94] *Piscatelli*, 424 Md. at 306, 35 A.3d at 1147 (quoting *Batson v. Shiflett*, 325 Md. 684, 726, 602 A.2d 1191, 1213 (Md. 1992)).
[95] *Id.*
[96] Henke Evidence Document, ¶ 30.
[97] Henke Ex. 1, at 1.
[98] This statement appears as a heading in bold type on page 2 of the Article.   Henke Evidence Document, ¶ 31.

> [H]e is also, as a former boss says, a 'Captain Ahab of his generation,' willing to wreck everything—including his family—chasing a dream that has become an obsession.[99]

> It was his boss at Exxon, Jack Templeton, who likens him to Herman Melville's Captain Ahab because of his messianic pursuit of his invention.[100]

Mr. Henke argues that these statements are clearly untrue. For example, he claims that he kept working on the Technology, not due to some obsession or quest for "geologic immortality," but because he faced difficult circumstances after he left the University, and he and his wife already had invested heavily in the Technology, which they had been developing for six years.[101]  He further argues that Mr. Dechter should not have placed much weight on Dr. Templeton's statements since he had not been in contact with Dr. Templeton since 1984.[102]

The Court finds that the Article does not portray Mr. Henke as unprofessional, reckless or deluded. But even assuming the Article could be read as such, the Article's theme is a protected opinion.[103]  Maryland law recognizes the fair comment privilege, which provides that "a newspaper, like any member of the community may, without

---

[99] Henke Ex. 1, ¶ 7.
[100] *Id.* ¶ 33. The Court notes some of these statements are quotes from Mr. Templeton, and therefore could not be attributed to the Sun. Mr. Dechter testified credibly that Mr. Templeton had in fact made those statements and Mr. Henke did not rebut his testimony. Mr. Dechter's notes from his conversation with Mr. Templeton also support the accuracy of the quotes. Debtors' Exhibit 19.
[101] Henke Evidence Document, ¶ 32.
[102] Henke Evidence Document, ¶ 35.
[103] "The principle that opinions based on disclosed facts are protected is well established." *Agora, Inc. v. Axxess, Inc.*, 90 F.Supp.2d 697, 704 (D. Md. 2000) (citations omitted).  The following example is commonly used to illustrate the line between actionable and protected statements of opinion: "[U]nlike the statement, 'In my opinion Mayor Jones is a liar,' the statement, 'In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin,' would not be actionable." *Agora*, 90 F.Supp.2d at 704 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed. 2d 1 (1990)). The distinction between opinion and fact is a matter of law. *Biospherics, Inc. v. Forbes, Inc.*, 989 F.Supp. 748, 751 n. 3 (D. Md. 1997) (citation omitted) *aff'd* 151 F.3d 180 (4th Cir. 1998).

liability, honestly express a fair and reasonable opinion or comment on matters of legitimate public interest."[104]  The fair comment privilege applies to public figures as well as to private figures.[105]

The fair comment doctrine protects an opinion only when "the facts on which it is based are truly stated or privileged or otherwise known . . . ."[106]  For instance, if a newspaper publishes "[d]erogatory opinions based on false and defamatory or undisclosed facts," then those statements would not be protected.[107]  But, "[d]erogatory opinions based on non-defamatory facts, true facts, privileged facts, or facts assumed mutually by the opinion-maker and the recipient are privileged."[108]

When evaluating a statement, the "primary emphasis [is placed] on verifiability of the statement" and a court should "examine the statement's language and context to determine if it could interpreted as asserting a fact."[109]  Here, the context and content of the Article's theme clearly reflect the author's opinion. References to Captain Ahab, as well as descriptions of Mr. Henke's efforts as "obsessive" or in pursuit of "geologic immorality" are subjective statements that are consistent with the "rhetorical hyperbole and imaginative expression" that "'negate

---

[104] *Piscatelli*, 424 Md. at 314, 35 A.3d at 1152 (quoting *A.S. Abell Co. v. Kirby*, 227 Md. 267, 272, 176 A.2d 340, 342 (Md. 1961)). In balancing the issue of whether the Article discusses a matter that is a legitimate public interest versus a disclosure of private facts about the plaintiff, I note that Mr. Henke approached the Sun about reporting on his circumstances and cooperated by providing the information underlying the Article, even though Mr. Henke's intent was to start an investigation into roadblocks to his success with the Technology, rather than an article that chronicled his lack of success through the years.

[105] *Id*. at 314 n. 4 (citations omitted).

[106] *Id*. at 315 (quoting *Kirby*, 227 Md. at 279-80).

[107] *Id*. at 316 (citations omitted).  "Though a statement of opinion is not immune from suit, a statement is not actionable unless it asserts a provably false fact or factual connotation."  *Agora*, 90 F.Supp.2d at 702 (citations omitted).

[108] *Piscatelli*, 424 Md. at 316 (citations omitted).

[109] *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (citations omitted).

the impression that the writing is stating fact.'"[110] Such statements are not meant to be verifiable facts. Further, to support this opinion, the Article includes numerous facts and quotations drawn from Mr. Dechter's interviews with Mr. Henke, his family and people who knew his work. There is no evidence that the underlying facts are false. Readers can draw their own conclusions (and form their own opinion) about those facts. Accordingly, the Court concludes that the evidence does not support a finding that the Article's theme is defamatory or false.

### b. *Material Concealments*

Mr. Henke's defamation claims assert that the Article materially conceals "the possibility that he, Ms. Henke, and their firm and family had fallen victim to [a] *campaign* that targeted them with official and professional misconduct."[111] Mr. Henke claims the Article omitted important details about the University's retaliation against him for his accusations of plagiarism and grade inflation. He further argues that the Article conceals material facts suggesting that government grant competitions were corrupted to ensure the proposals submitted by Mr. and Ms. Henke would fail.[112]

For defamation purposes, a "false statement is one that is not substantially correct . . . [M]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting of the libelous charge be justified."[113] Omitting material facts, however,

---

[110] *Agora*, 90 F.Supp.2d at 703 (quoting *Biospherics,* 151 F.3d at 184).

[111] Henke Evidence Document, ¶ 36 (emphasis in original).

[112] Henke Evidence Document, ¶¶ 44-48.

[113] *Batson v. Shiflett*, 325 Md. 684, 726, 602 A.2d 1191, 1212 (Md. 1992) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (internal quotation marks omitted)). "Put another way, the statement is not considered false unless it 'would have a different

may lead to liability because that "can render an account just as false as an outright misstatement . . . [T]he literal truth of each individual statement is not a defense in such cases."[114]    But omitting facts favorable to the plaintiff does not automatically render a statement false:

> [T]he First Amendment prohibits a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light. Thus, as long as the matter published is substantially true, the defendant is constitutionally protected from liability [based on falsity], regardless of its decision to omit facts that may place the plaintiff under less harsh public scrutiny.[115]

Mr. Henke has not proven that the Article conceals material facts, thereby making its contents false.  The Article does not omit facts related to Mr. Henke's claims about the campaign against him, his wife, their Company and the Technology:

> [F]ederal grant dollars that had flowed in regularly during his first three years at [the University] suddenly slowed to a trickle.
>
> Convinced that grant-application rejections were linked to personal animus within his department, Henke began filing formal objections with the National Science Foundation—an impolitic move that would foreshadow later lawsuits against the federal hand that feeds.[116]

---

effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517 (citations omitted).

[114] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 n.28 (10th Cir. 2017), (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)).

[115] *Brokers' Choice*, 861 F.3d at 1108 (internal citations and punctuation omitted).

[116] Henke Ex. 1, ¶¶ 46-47. Mr. Henke takes issue with statements in the Article suggesting that the grant funds slowed because he began filing formal objections with the National Science Foundation while he was still employed with the University. Henke Ex. 1, ¶¶ 46- 48.  However, he points out that he did not file objections with the NSF while at the University and, further, that his suspicions about an unfair or "rigged" review process for his grant proposals did not arise until *after* he had left the University. Henke Evidence Document, ¶¶ 40-41.  He asserts that these statements suggest that he rashly provoked the NSF while at the University.  *Id.*  Mr. Henke's journal entry on October 5, 2007 mentioned his conversation with Mr. Dechter in which he stated that he had written to NSF in 1986 about changing a bureaucratic deadline for submissions, which Mr. Henke did not think was a "major issue." Henke Ex. 7 at 56.  Mr. Henke's arguments about timing issues amount to minor inaccuracies

> By 1994, Robert and Wanda were convinced that their difficulty in winning grants was not because they had bitten off more science than any two people could chew – but because the fruits of their labor were being poisoned by rivals.[117]

Mr. Henke originally approached the Sun to investigate the University and the Sun in hopes of uncovering direct evidence of the alleged campaign. Without such evidence, the Sun could not include as many details about the alleged campaign as Mr. Henke would have liked.

Mr. Henke also argues that the Article falsely represents the reasons he left the University by asserting that the Technology "cost him . . . an aborted academic career,"[118] that he lost the University job "for failing to publish a single research paper in five years,"[119] and that he "ignored the publish-or-perish warning."[120] Mr. Henke claims the Article omits the important facts surrounding his departure from the University: that is, his "whistle-blower" allegations of plagiarism and grade inflation.[121] However, Mr. Dechter testified that Mr. Henke did not have proof to support his allegations.[122] The Article's discussion about Mr. Henke ignoring the "publish-or-perish" warning is based on quotes from University officials interviewed by Mr. Dechter.[123]

---

while the Article captures Mr. Henke's theory that his proposals were targeted unfairly. The Court does not agree that such minor inaccuracies render the Article false.

[117] Henke Ex. 1, ¶ 64.

[118] Henke Ex. 1, ¶ 9.

[119] *Id.* at ¶ 24.

[120] *Id.* at ¶ 45. *See also* Henke Evidence Document, ¶¶ 38, 38a – 38j, 39.

[121] *Id. See also* Henke Ex. 8 (marked confidential).

[122] Tr. 7/2/2019 at 69:9 – 71:17 (Dechter).

[123] Henke Ex. 1, ¶¶43-45.

The Court concludes that Mr. Henke has not proven that the Article is false because it omits additional facts that might cast him in a more favorable light. The excluded details either are not well-documented or are not material enough to change the tenor or meaning of the Article.  Although the Article did not include all facts requested by Mr. Henke, the omission does not run afoul of Maryland law.[124]

### c. *Personal Attacks*

In the Amended Complaint, Mr. Henke alleges that the Article defames him through "direct personal attacks," including, that the Sun (i) falsely represented his "discharge from the Air Force as less than honorable,"[125] (ii) falsely represented him as profane,[126] and (iii) falsely represented his parenting intentions and practices.[127] In support of his argument, Mr. Henke cites to the following paragraphs of the Article:

> After finally graduating with a mechanical engineering degree from N.C. State, Henke signed up for an Air Force officer's training course. Just two months later, Henke had arranged for a "self-initiated elimination" and was back in North Carolina.[128]

> While the young Robert [Henke] had found social refuge in clowning and cartoons, he rarely permitted his sons to traffic in popular culture. No movies, no video games, no television save the occasional videotaped History Channel documentary. Even books were suspect.[129]

> Michael, who maintains a deep love for his father, recalls having to read books in secret. "It was crazy," he says. "It was unbelievable, especially from someone as intelligent as my father, who reads a lot."[130]

---

[124] Rather than a true disagreement over the substance of the facts, it appears that the heart of Mr. Henke's dispute is that the Sun failed to publish an article that aired his grievances against the University and the Sun. The Sun had no legal duty to publish such an article, and Mr. Henke has no right to demand one. There is a disagreement on opinion, not distortion of the truth.

[125] AC ¶ 57

[126] AC ¶ 60

[127] AC ¶ 62

[128] Henke Ex. 1, ¶ 98; AC ¶ 57.

[129] Henke Ex. 1, ¶ 69; AC ¶ 64-66.

[130] Henke Ex. 1, ¶ 71; AC ¶ 69.

> "When you grow up without religion, someone must supplant God," Michael says. "And my father became that for me and ... I could not help but fear his wrath," he says.[131]

> "My father said, 'F_____ furniture, I'll put a whole bunch of boxes together and make a couch.'"[132]

Mr. Henke disputes the truth of these assertions and argues that the statements defamed him.

The Court disagrees that the Article's descriptions of Mr. Henke's parenting style are the sort of statements that would expose him to public contempt or ridicule. The Court does not doubt that Mr. Henke is a loving parent and does not find that the statements in the Article would discourage other people from associating or dealing with him. Many parents monitor and restrict their children's media consumption. In the Amended Complaint, Mr. Henke includes additional facts to rebut the truth of the statements,[133] but as discussed above, omission of Mr. Henke's preferred facts does not render the statements false. Further, the Court rejects Mr. Henke's argument that the Article's statements imply a "hidden meaning" or compare Mr. Henke's actions to a "Nazi mindset" of book-burning.[134]

Moreover, neither the Article's brief discussion of his "self-initiated elimination" from a military training program nor his son's quote attributing swear words to Mr. Henke are statements that would cause Mr. Henke to lose standing in

---

[131] Henke Ex. 1, ¶ 69; AC ¶69.

[132] Henke Ex. 1, ¶ 23; AC ¶ 60.

[133] In his Amended Complaint, he states (for example) that his children watched movies every week as a family (¶ 65), he read books with his sons (¶ 66), and his family engaged in many activities of popular culture, including trips to Disney World, youth sports, major sporting events, plays, museums and the beach (¶ 64).

[134] Henke Evidence Document, ¶ 68d.

the community or otherwise meet the standard for defamation. Mr. Henke has not proven that the Article's reporting on these matters is false or that Mr. Dechter misquoted his son. The Court does not conclude that the Article's statements on these issues are defamatory or false.

### d. *Falsification Regarding Technology*

Mr. Henke also asserts that the article "falsely represent[s] the technology as unpromising and the undertaking as unproductive and so [falsely represents Henke] as delusional and unaccomplished."[135] He also claims that the Article describes him as "unprofessional" and "greed-driven,"[136] and belittles the Technology as "basement development."[137] He also notes that the Article omits positive information about the Technology, for example, optimistic reports about the Technology in 1986 by the National Institute of Standards and Technology,[138] and successful field tests with support from the Federal Highway Administration.[139]

The Court disagrees with Mr. Henke's assessment. The Article does not attack his qualifications and does not offer a conclusion on the Technology's value. Mr. Henke's Amended Complaint cites to words and phrases out of context of the overall Article. One could also easily state that the Article exalts Mr. Henke and the Device, comparing him to the celebrated mathematician John Nash[140] and commenting that the Device "ought to grab the world's attention."[141] The overall gist of the Article is

---

[135] AC ¶ 72
[136] AC ¶ 79
[137] AC ¶ 73.
[138] AC ¶ 74.
[139] AC ¶ 76.
[140] Henke Ex. 1, ¶13.
[141] *Id.* ¶ 2.

a story about Mr. Henke's relentless determination and willpower to complete his quest to develop a device that "could prevent building collapses and save lives. If it works."[142]  The omission of Mr. Henke's preferred facts is not actionable unless the omission creates a falsity.[143]  The Court does not agree that the Article falsifies the value, promise or sincerity of the Technology.  The Court concludes that Mr. Henke has not proven that the Article is defamatory or false in its discussion of the Technology.

## 2. *Negligence*

As discussed above, for purposes of this Opinion, the Court considers Mr. Henke a private individual. Mr. Henke, therefore, must show by a preponderance of the evidence that the Sun (1) knew the Article's statements were false, (2) acted in reckless disregard to the truth, or (3) acted negligently in failing to ascertain the truth.[144]

The Court again observes that Mr. Henke has not shown that any of the statements in the Article are false.  But even assuming, without deciding, that he had, Mr. Henke also failed to show that the Sun acted negligently. The Court heard testimony from Mr. Dechter and admitted into evidence the notes that he took during his interviews.[145]  Mr. Dechter testified about the editorial process used for this

---

[142] Henke Ex. 1, ¶¶ 4-5.

[143] *Brokers' Choice*, 861 F.3d at 1108.  *See* n. 114-15, *supra*.

[144] *Jacron Sales*, 276 Md. at 597, 350 A.2d at 698 (1976).

[145] Tr. 7/2/2019 at 56:15 – 57:17 (Dechter). Mr. Dechter testified that sometimes he recorded his interviews with Mr. Henke, his family and others, but he also testified that the Sun had no official retention policy. Tr. 7/2/219 at 54:19 – 56:14. Usually, he kept recordings while he was working on a project.  *Id.* Consistent with his usual practice, he had long ago disposed of the recordings of the interviews for the Article.  *Id.* In the pre-trial conferences and his closing statement, Mr. Henke argued

Article, the purpose of which includes ensuring its accuracy before publication.[146] He also testified that, when possible, he investigated allegations and facts that he had collected in the interviews from other sources.[147]  Mr. Dechter's written notes faithfully reflect the Article's contents and his testimony at trial was credible and sincere.[148]

In addition, Mr. Henke's journal entries largely support Mr. Dechter's testimony and verify that Mr. Dechter called him to check facts.[149] The record reflects that Mr. Dechter followed journalistic standards and confirmed the Article's contents before it went to print. Mr. Henke did not submit any evidence of negligence, and the record reflects that the Sun was diligent in verifying the contents of the Article before it went to print.  The Court rejects Mr. Henke's claim that the Sun acted negligently.

### 3. *Harm*

Mr. Henke alleges that the Article  has caused him and his family countless harms and has led to their financial ruin.[150]  He seeks redress of $100 million.[151] Under Maryland law, "[i]t is the general rule that one may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as

---

that this destruction of evidence proves that the Sun acted with actual malice.  The Court disagrees and does not find that there was any deliberate spoliation of evidence.

[146] Tr. 7/2/2019 at 59:6 – 61:4 (Dechter).

[147] *Id.* at 70:5 – 72:11 (investigated University claims); 75:2 – 76:9 (investigated military service).

[148] Debtors' exhibits 1-8, 10-25, 27, 31-32, 34-36, 38-43.

[149] In Journal Entry dated July 19, 2007, for instance, Mr. Dechter had asked whether he had papers showing that he received an honorable discharge and Mr. Henke recorded in his journal that he didn't know if he had papers, but Mr. Henke asked Mr. Dechter to check records. Henke Ex. 7 at 53. In addition, in his journal entry on October 5, 2007, Mr. Henke recorded in his journal that Mr. Dechter called him to check facts. Henke Exhibit 7.

[150] AC ¶¶ 126 - 135.

[151] AC ¶ 136.

the natural, proximate and direct effect of the injury."[152] Put simply, Mr. Henke needs to prove that the Article is the root of his injuries.

Mr. Henke has not shown that the Article caused the harms that he has suffered. According to his own account of the facts in the Amended Complaint, many injuries befell him and his family *before the Article was published*.[153] In the Amended Complaint, Mr. Henke claims that the Article exacerbated his problems, including:

(1)    "Harm to reputation" –Mr. Henke refers to a letter to editor stating "I was sad after reading the story of Robert Henke and his soil probe. . . .Here's a gifted man whose brilliance is overshadowed by his selfishness. . . . It's too bad that Mr. Henke's legacy will be a shattered dysfunctional family."[154]

(2)    "Denied Justice and Redress" –Mr. Henke asserts that the Article prevents him from drawing any "interest into investigating his circumstances, in hopes of restoring well-being to his family."[155]

(3)    "Denied Professional Prospects" –Mr. Henke claims the Article deprived him of employment prospects including a job with the Nuclear Regulatory Commission, editing a journal manuscript or a future in academia.[156]

(4)    "Deteriorating Financial State" – Mr. Henke claims that depriving him of professional prospects contributed to his deteriorating financial state.[157]

(5)    "Compromised Social Standing" – Mr. Henke asserts that the Article irreversibly deprived him of social standing so that he could "never again live comfortably in the state of Maryland, where he had hoped to return."[158]

---

[152] *SG Homes Assoc., L.P. v. Marinucci,* 718 F.3d 327, 336 (4th Cir. 2013) (quoting *Empire Realty Co., Inc. v. Fleisher,* 269 Md. 278, 305 A.2d 144, 147 (1973).

[153] AC ¶ 9. ("When he approached *The Sun* during 2006, plaintiff, the firm, and his family had already suffered much harm, he believes, as a direct or indirect result of the misconduct.").

[154] AC ¶ 126.

[155] AC ¶ 128.

[156] AC ¶¶ 129 – 130.

[157] AC ¶ 131.

[158] AC ¶ 132.

(6)    "Distraction" – Mr. Henke claims that "[t]he [A]rticle and its aftermath have distracted plaintiff greatly from his family and other matters." Self-representation in the bankruptcy court and circuit court litigation has been "particularly consuming."[159]

(7)    "Emotional Distress" – Mr. Henke asserts that the Article caused him emotional distress and invaded his privacy.[160]

(8)    "Harm in Relation to Possible Interference with Search for Representation" – Mr. Henke claims that the Article prevents him from attracting representation for a lawsuit against the Sun.[161]

However, when Mr. Henke approached the Sun in 2006, he was seeking redress for similar harms that, at the time, he alleged were caused by the University.[162]  Mr. Henke has not presented any evidence connecting his failure to get a job that he interviewed for in June 2007 with the Article's later publication in October 2007.[163] For the reasons stated above, Mr. Henke has not proven that the Article was defamatory or false or published with negligence. A failure to prove these elements prevents any recovery.  However, upon review of the evidence in this case, the Court

---

[159] AC ¶ 133.

[160] AC ¶ 134.

[161] AC ¶ 135.

[162] Henke Ex. 2; Debtors' Ex. 44.  (Henke Letter to R. Mason, Chair of the University Board of Trustees dated November 30, 2006) ("The excesses of which I feel the University may be guilty have harmed my family and firm immeasurably. The family has been broken apart. We have lost our home, we have lost our security, we have no favorable prospects, our financial standing has been blackened, and our firm's progress—which had been substantial—has been brought to a standstill. Even more disturbing, my son has experienced serious juvenile difficulties . . . . I do not believe that my family would have suffered any of these indignities were it not for what I believe were extraordinary malicious efforts on the part of the University to undermine, without respectable cause, our ability to succeed professionally.")

[163] Journal Entry dated June 29, 2007, Henke Ex. 7 at 51; *see also* Journal Entry dated October 5, 2007 (Mr. Henke said he thought he could still be in the running for the position but admitted, "I'm worried because of IG's reports.") Henke Ex. 7 at 56.

also concludes that Mr. Henke's evidence does not prove that his condition - - or his family's condition - - materially worsened after the Article was published.

## B. <u>Misrepresentation and Stalking</u>

In addition to the defamation claims, Mr. Henke asserts five counts of misrepresentation.[164]

| Count 12: Misrepresentation of intent | Mr. Henke alleges the Sun had said it wanted to write an article about the Device, not a human-interest piece |
|---|---|
| Count 13: Misrepresentation of need for proof | Mr. Henke alleges at the outset of the process, the Sun led Mr. Henke to believe that proof of his concerns was not important.  When the Sun later asked for proof his allegations, he told Mr. Dechter that "if he had proof he wouldn't have needed *The Sun.*"[165] |
| Count 14: Silent misrepresentation regarding Air Force | Mr. Henke alleges that the Sun agreed to keep private the reason he left the Air Force |
| Count 15: Misrepresentation regarding treatment of younger son | Mr. Henke alleges the Sun had promised to not write about his son's legal issues |
| Count 16: Silent Misrepresentation of the Sun's neutrality | Mr. Henke alleges Mr. Dechter failed to disclose that he held a degree from and had taught at Johns Hopkins University |

To succeed on a claim of fraudulent misrepresentation, Mr. Henke must show five elements:  (1) a false representation was made, (2) its falsity was either known

---

[164] AC ¶¶ 94 – 116.
[165] AC ¶ 105.

to the maker or was made with such reckless indifference to the truth as to be the equivalent to actual knowledge of falsity; (3) the representation was made for the purpose of defrauding the plaintiff, (4) the plaintiff not only relied on the representation but had a right to rely on it and would not have done the thing from which the injury arose had the misrepresentation not been made, and (5) the plaintiff actually suffered damages directly resulting from the misrepresentation.[166]

Mr. Henke has fallen short of his burden. First, Mr. Henke's journal entries show that he knew the Article was going to be a "human interest" story that focused on him and on "devising something new that is useful and the troubles you experience" in development.[167]  There is no evidence that the Sun represented that it did not need proof of Mr. Henke's allegations. Moreover, the journal entries reflect that Mr. Dechter told Mr. Henke that writing about the Air Force discharge was a "key element of the story."[168]  Mr. Henke's journal notes that, when talking about the possibility of attending his son's court date, Mr. Dechter assured Mr. Henke that he "wouldn't exploit [his son],"[169] but the journal also shows that he knew the Article would include reference to his son's problems.[170] As far as Mr. Dechter's failure to

---

[166] *Charter Oak Fire Ins. Co. v. American Capital, Ltd.*, No. Civ.A. DKC 09-0100, 2011 WL 856374, *11 (D. Md. Mar. 9, 2011) (quoting *Swinson v. Lords Landing Vill. Condo.*, 360 Md. 462, 476, 758 A.2d 1008 (Md. 2000)).

[167] Journal Entry February 10, 2007. Henke Ex. 7 at 36.

[168] Journal Entry May 4, 2007.  Henke Ex. 7 at 48.

[169] Journal Entry April 20, 2007. Henke Ex. 7 at 37.

[170] Journal Entry October 5, 2007. Henke Ex. 7 at 57.  Mr. Dechter also testified that the newspaper was sensitive about including information about juveniles in stories and that the Article followed those policies and procedures when writing about Mr. Henke's son.  Tr. 7/2/2019 at 53:8 – 53:24.

mention his affiliation with the University, the Sun had no duty to disclose that information and it is neither relevant nor material.[171]

The Court concludes that Mr. Henke failed to prove that Mr. Dechter or the Sun made any fraudulent misrepresentations to Mr. Henke. And, as discussed above, Mr. Henke has not proven that he suffered any damages as a result of any alleged misrepresentation.

Mr. Henke does not allege a separate cause of action for stalking, but to the extent that it is relevant to the defamation or misrepresentation claims, the Court finds that the Sun did not stalk or attempt to intimidate him. To prove his point, Mr. Henke produced a stack of newspaper clippings from the Sun dating back to 1990 that, he alleges, each refer to a person, place, or thing that is related to him in one way or another. Many articles mention acquaintances of the Henke family. Others reference San Francisco, where the Henkes had gone on a trip. In one instance, the author cites to a Mr. Robert I. Henkin. To the extent these articles track Mr. Henke, the Court finds it is simply a coincidence. It is clear that the Sun did not try to intimidate Mr. Henke and there is no indication whatsoever that anyone stalked him.[172]

---

[171] *Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 389 (Md. App. 2008) (holding that the elements of fraudulent concealment under Maryland law are (1) a duty to disclose a material fact, (2) failure to disclose, (3) intent to defraud, (4) reliance, and (5) damages).
[172] At trial, Mr. Henke stated that he concluded that the articles were evidence of stalking long after they were published. If he was intimidated, it was only in retrospect.

## VI.    CONCLUSION

For the reasons stated above, the Court sustains the Debtors' objection to Mr. Henke's claims. The Debtors' counsel is requested to submit a proposed form of order consistent with the foregoing with fourteen days of the date hereof.[173]

Dated: March 3, 2020
        Wilmington, Delaware

                              FOR THE COURT:


                              Brendan Linehan Shannon
                              United States Bankruptcy Judge

---

[173] As discussed in n. 24, *supra.*, Mr. Henke's evidentiary submissions include the Henke Evidentiary Materials. The Court represented to Mr. Henke that the original Henke Evidentiary Materials would be returned to him following the issuance of this Opinion.  The Court will either make these materials available to Mr. Henke to be picked up from the Bankruptcy Court or will direct the Debtors to pay to ship the Henke Evidentiary Materials back to him, at Mr. Henke's election.  The parties should confer and include Mr. Henke's election as part of the Order to be provided to the Court by Debtors' counsel.