<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3  IN RE:                          .  Chapter 11
                                    .  Case No. 08-13141 (BLS)
 4  TRIBUNE MEDIA COMPANY,          .
    et al.,                         .  Jointly Administered
 5  (F/K/A TRIBUNE COMPANY),        .
                                    .
 6                                  .  Courtroom No. 1
                                    .  824 Market Street
 7          Reorganized Debtors. .  Wilmington, Delaware 19801
                                    .
 8                                  .  Thursday, September 17, 2020
    . . . . . . . . . . . . . . . .  10:02 A.M.
 9
                    TRANSCRIPT OF TELEPHONIC HEARING
10           BEFORE THE HONORABLE BRENDAN L. SHANNON
                  UNITED STATES BANKRUPTCY JUDGE
11
    APPEARANCES:
12
    For the Reorganized
13  Debtors:                  James O. Johnston, Esquire
                              JONES DAY
14                            555 South Flower Street
                              50th Floor
15                            Los Angeles, California 90071

16                            -and-

17                            J. Kate Stickles, Esquire
                              COLE SCHOTZ, P.C.
18                            500 Delaware Avenue
                              Suite 1410
19                            Wilmington, Delaware 19801
    (APPEARANCES CONTINUED)
20  Electronically
    Recorded By:              LaCrisha Harden, ECRO
21
    Transcription Service:    Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            Telephone: (302) 654-8080
                              E-Mail:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording:
25  transcript produced by transcription service.
</pre>

1  <u>APPEARANCES (CONTINUED)</u>:

2  For Wilmington Trust
   Company:                    James W. Stoll, Esquire
3                              Shari I. Dwoskin, Esquire
                               BROWN RUDNICK, LLP
4                              One Financial Center
                               Boston, Massachusetts 0211
5
                               -and-
6
                               William D. Sullivan, Esquire
7                              SULLIVAN HAZELTINE ALLINSON, LLC
                               919 North Market Street
8                              Suite 420
                               Wilmington, Delaware 19801
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 1:   Notice of Rescheduled Oral Argument With Respect    4
4              to Remand Issues Relating to 1F Claim Objection
               (Filed August 6, 2020) (Docket No. 14714)
5

6    Transcriptionist's Certificate                              88

7                             -o0o-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 10:02 a.m.)

2           THE COURT:  Good morning, all.  This is Judge

3   Shannon.  I understand from the operator that all necessary

4   parties are on the call.

5           This is an argument or hearing in Tribune Media

6   Company, Case Number 08-13141, and I want to emphasize that:

7   08-13141.

8           I'm glad to see everybody today.  I have received

9   the pleadings, as well as demonstratives that parties are

10  going to share.  Obviously, as you know, I have inherited

11  this case from Judge Carey -- a pox on his house -- but I am

12  up to speed both, on the case, as well as, on the submissions

13  that the parties have made.  So, I have a pretty good

14  grounding in the matter on remand.

15          And, again, today's argument stems from, I think a

16  status conference we had many months ago where the parties

17  committed to sort out exactly how it would be presented on

18  remand and, again, I felt that the briefing was excellent and

19  helpful, and I appreciate the coordination between the

20  parties.  It's not lost on me the amount of effort it takes

21  to get to a point where we can logically present these in a

22  coherent manner, especially after such a long road to get

23  here.

24          So, with that, I am happy to proceed.  As I

25  understand it, we'll be proceeding, basically, on the

1  debtors' objection and WTC's response.  But if the parties

2  have had a discussion about the order of battle or who's

3  going to speak first and who's going to speak last, I'm at

4  your pleasure.

5           I'll hear first from counsel for the reorganized

6  debtor.

7           MR. JOHNSTON:  Good morning, Your Honor.

8           Jim Johnston of Jones Day on behalf of Tribune

9  Media, as it's now known.

10          THE COURT:  Good morning.  Good to see you.

11          MR. JOHNSTON:  Good to see you, as well.  I

12  appreciate the accommodation.

13          This is Wilmington Trust's claim, and having the

14  burden here, I think, typically, the claimant would go first.

15 We haven't had any conversations with Wilmington Trust about

16 the order of this argument, but I'm happy to proceed in

17 whichever way would be most helpful to Your Honor.

18          THE COURT:  All right.  Well, let me hear from

19 counsel to Wilmington Trust.  I'm really at your pleasure,

20 and this is one where it could go either way.

21          So, counsel?

22          MR. STOLL:  Good morning, Your Honor.

23          James Stoll from Brown Rudnick, on behalf of

24 Wilmington Trust Company and with me, as well, is my

25 colleague Shari Dwoskin.

1      So, yeah, we -- our local counsel spoke, but Jim

2 and I did not speak.  Our thought was that it was their

3 objection to our proof of claim, so it made sense for them to

4 go first.

5      THE COURT:  I think so, too.  I mean, I don't

6 disagree with Mr. Johnston that it is your claim and, you

7 know, everybody is familiar with Allegheny and how the claim

8 goes back and forth, but to me it seems that the issues

9 raised by the reorganized debtor kind of frame the argument

10 and that's really how the briefing is structured.

11      So, if it's okay with you folks, I would probably

12 hear first from the reorganized debtor.  I have gotten your

13 PowerPoint, and I believe we've given privileges so you guys

14 can put that up on the screen if you'd like.

15      MR. STOLL:  Yeah, very good, Your Honor.  Thank

16 you.

17      MR. JOHNSTON:  This is Jim Johnston, again, on

18 behalf of the reorganized debtors and I will toggle back and

19 forth between the six slides that we sent in this morning.

20 I'll put them up on the screen and then take them down.  If I

21 go too fast or slowly, please nudge me along and let me know.

22      Your Honor, I'll start with the point of

23 agreement.  Certainly, with you and your remarks this

24 morning, and I think Wilmington Trust would readily agree

25 that there's no question that Judge Carey's departure has put

1   you in a difficult position.

2       (Laughter)

3       MR. JOHNSTON:  You're faced with a claim for fees

4   from a bankruptcy case that was filed 11 and a half years ago

5   and heard in its entirety by a different bankruptcy judge.

6   That is not the way these things usually work.

7       I think it's pretty clear that as a result of that

8   factual circumstance, Wilmington Trust sees an opportunity

9   here.  As you saw from the briefs, as you'll see in the

10  PowerPoint that they sent over to you, Wilmington Trust

11  really would like you to just throw up your hands and do

12  rough justice or trim the fat or whatever other *cliche* you

13  want to pick.  Wilmington Trust will tell you that this is

14  just a routine fee request in a routine bankruptcy, there's

15  nothing to see here, just move along.

16      And that, Your Honor, is just simply not the case.

17  Judge Carey knew it all too well.  There's nothing routine

18  about, frankly, the creeping bankruptcy and certainly about

19  this fee request, but Judge Carey never ruled on the

20  specifics of the fee claim because he disallowed it in full

21  as a matter of law.  We, of course, think he was right on

22  that and eventually we may be able to persuade the Circuit on

23  that, but for today, we'll deal with the claim as it is.

24      For the reasons I'll summarize, and I will try to

25  be relatively brief, the undisputed record before you is more

1  than sufficient to sustain Tribune's objection and disallow

2  all but $1,740,200 of this claim.  So, I will start with a

3  summary of the claim and, as you know, we prepared a

4  demonstrative that we sent over this morning.  So, I will put

5  this up on the screen right now.

6          I'm getting a message, Your Honor, that says host

7  disabled attendee screen-sharing.

8          THE COURT:  Hang on just a second.

9          LaCrisha, this is Judge Shannon.  Can you give

10 Mr. Johnston privileges to share the screen.

11         THE CLERK:  Yes, Your Honor.  I'm doing it now.

12         THE COURT:  Great.

13     (Pause)

14         THE CLERK:  You should be all set, Mr. Johnston.

15         MR. JOHNSTON:  Okay.  Let's see.  It is.

16         THE COURT:  Great.

17         MR. JOHNSTON:  Okay.  So, this is our first slide.

18 As you can see here, Wilmington Trust requests allowance of

19 the claim for roughly $2.79 million.  Of that amount, nearly

20 $21 million [sic] is attributable to its counsel, Brown

21 Rudnick, and more than $7.5 million is attributable to

22 Mesirow, a financial advisor that wound up wearing multiple

23 hats during the case.

24         The chart shows that Wilmington Trust previously

25 requested $1.4 million in fees for its service as a member of

1  the official committee of creditors.  Judge Farnan, acting as

2  mediator, recommended disallowance of $679,000 of that

3  amount.  Wilmington Trust, then, withdrew its request for the

4  excess amount and Tribune paid the balance of approximately

5  $763,000.

6          Wilmington Trust also made a substantial

7  contribution claim for $7.1 million.  Here, again, Judge

8  Farnan recommended disallowance of all but $497,000 of that

9  amount, which Tribune then paid.

10         There's no dispute that (audio interference) and

11  it's the balance --

12         THE COURT:  Hang on, Mr. Johnston.

13         You froze for just a second.  You started with,

14  "There is no dispute ..."

15         MR. JOHNSTON:  Okay.  There's no dispute, Your

16  Honor, that Wilmington Trust only paid -- can you hear me,

17  Your Honor?

18         THE COURT:  I can hear you just fine.  Your screen

19  has frozen.

20         MR. JOHNSTON:  Yes, Your Honor.

21         THE COURT:  Let me make a comment.

22         We have been operating effectively with Zoom now

23  for many months, but I would observe that in just this week,

24  it's not just my court, it's the Judiciary, or at least the

25  Delaware Court has had issues with Zoom freezing up on us.

1          So, I want to be clear that if we have issues with

2  this, we're going to reschedule, because the parties put a

3  lot of effort into trying to schedule this live, which is not

4  an option now, and so I just want to be clear that we've had

5  some technical issues that are kind of new to us.

6          And so -- anyway, one thing you might do,

7  Mr. Johnston, is turn your camera -- it seems like you've

8  turned your camera off -- turn your camera back on and that

9  might get us back and running, okay.

10          MR. JOHNSTON:  Your Honor, I apologize.  I believe

11  this issue is on my end.  I'm looking at my router and it

12  just went out.  I mean, this happens like once every two

13  months, so I have just restarted it.  So, if you give me --

14  it usually takes 60 seconds -- I am hopeful that it will

15  reconnect.

16          THE COURT:  Okay.  And if you want to continue

17  with your argument, I will note that I do have your

18  demonstrative in hand and that's fine with me and I'm happy

19  to proceed.

20          MR. JOHNSTON:  It is in the process of

21  reconnecting.  Okay.  Let's see if it -- okay.  It went back

22  on.  My connection has been restored.

23          I am going to reconnect to the Zoom right now,

24  Your Honor --

25          THE COURT:  Okay.

1    MR. JOHNSTON:  -- and then I will go on.

2    It's Murphy's Law.

3    THE COURT:  You know, I have commented a lot about

4  this.  First of all, I would never have imagined that this

5  process would have worked as well.

6    If you had asked me whether we could operate the

7  courts remotely, eight months ago I would have said

8  absolutely not.  So, it's worked pretty well, but I will be

9  clear:  I hate every minute of this.

10    MR. JOHNSTON:  I would much rather be in Delaware

11  this morning.

12    THE COURT:  But, you know, it is the best that we

13  can do and, again, I have no issues with, you know, trying to

14  sort through this and everyone has been, I think, patient and

15  ideal about it.

16    So, I see you're back, Mr. Johnston.  Let's roll

17  forward.

18    MR. JOHNSTON:  Okay.  Thank you, Your Honor, and I

19  apologize, again.

20    THE COURT:  No problem.

21    MR. JOHNSTON:  I'm trying to share the

22  demonstrative again and I'm disabled.  So, if I could be re-

23  enabled again, please.

24    THE COURT:  LaCrisha, could you re-enable

25  Mr. Johnston.

1          THE CLERK:  Yes, Your Honor.

2          THE COURT:  Okay.  Thank you.

3          THE CLERK:  He should be good to go as co-host.

4          MR. JOHNSTON:  Okay.  There it is.  We're back.

5          So, I think I got cut off when I was saying that

6   there is no legitimate dispute that Wilmington Trust only

7   paid $3 million of the fees it now claims and is not liable

8   for the balance.

9          As I'll get to in a moment, we submit that this

10  means that Tribune, itself, is not liable for the vast

11  majority after the claimed fees.  And as you can see in the

12  middle box here, once you deduct the payments made by Tribune

13  from the maximum $3 million potential claim, you get to an

14  allowable claim of no more than $1.74 million.

15         Finally, as you can see in the bottom box, the

16  allowed amounts of the subordinated (indiscernible) notes for

17  which Wilmington Trust was indenture trustee, was

18  approximately $759 million.  But the holders of those notes

19  recovered nothing from Tribune under its plan.  They got

20  zero.

21         So, I will stop sharing for a moment.  I'll take

22  that back down.

23         With that summary, Your Honor, I have four points

24  to make this morning.  Point number one, as I just previewed

25  is that, as a matter of law, Wilmington Trust has no claim

1  for fees that it did not pay and is not liable for.

2          Here's some background, as necessary.  Earlier in

3  the bankruptcy case, two of the (indiscernible) noteholders

4  agreed to pay Wilmington Trust professionals, but those

5  holders cut off the funding after a few months.  They said

6  they wouldn't pay more than $3 million total.  This, as we'll

7  see, caused the fee change in Wilmington Trust's relationship

8  with Brown Rudnick and with Mesirow.

9          So, I'll bring the slide back up here and we'll

10  turn to Slide 2.  What we see here, Your Honor, is an excerpt

11  of Wilmington Trust's amended engagement agreement with the

12  Brown Rudnick firm.  It's dated October 28th, 2010, which was

13  about 10 months in the bankruptcy case.  You can find this

14  complete document at Exhibit H to my declaration, which is on

15  the docket at Number 13402-11 and it's also Tab 3 in the

16  index of the pleadings that were submitted to you.

17          Now, Brown Rudnick's initial engagement agreement

18  prior to this one called for payment of hourly fees, as you

19  would expect, but as you can see here, after the noteholder

20  funding was cut off, Brown Rudnick switched from an hourly

21  fee to a contingency fee where it would get, quote, 10

22  percent of all recoveries obtained by the trustee -- that's

23  Wilmington Trust -- or the holders, on account of the PHONES,

24  with no ceiling or maximum, unquote.

25          In the paragraph below that, you can see that

1   Brown Rudnick agreed that Wilmington Trust, itself, would

2   have no liability for the fees.  Brown Rudnick agreed to be

3   paid by the PHONES noteholders or paid from recoveries on the

4   PHONES notes.

5          Now, let's pause for a second and look more

6   closely at the fee provision in the paragraph on the top.

7          THE COURT:  Well, let's stop for just a second,

8   Mr. Johnston.  I guess I'd like your thoughts.

9          The response from WTC or Brown Rudnick is this is

10  not an unusual or remarkable situation, that we've got a sort

11  of two-pronged engagement, particularly, when representing a

12  creditor in a bankruptcy proceeding.  So, the idea that, you

13  know, there's a contingency, it does provide for fees and

14  expenses or the contingency.

15         So, is that fatal?

16         And then the next question would be, and I think

17  you're getting here, so I just want to make sure that we're

18  on the same page, when WTC responds to this argument and

19  says, Look, you know, the idea (audio interference) fees as a

20  practical matter, fees are technically reimbursements to

21  people like indenture trustees of administrative agents, et

22  cetera, but they're generally paid directly.

23         And, you know, so this is sort of elevating.  I

24  think if I understand their argument, it is that the debtors'

25  position or objection on this point is elevating form over

1  substance, and I would like your thoughts.

2          MR. JOHNSTON:  Okay.  Thank you, Your Honor.

3          And you did anticipate exactly where I was going.

4  When you look at the fee provision it says provide for quote,

5  unquote, the higher of the contingency fee or the hourly

6  fees.  And Wilmington Trust points to that provision to

7  justify its claim for $21 million in hourly fees, not the

8  contingency fees.

9          But under the circumstances of this case, Your

10  Honor, that provision was meaningless.  By the time this

11  agreement was executed the PHONES holders had stopped funding

12  and --

13          THE COURT:  Hang on.  Mr. Johnston, I apologize.

14          We're getting some feedback, so I would ask that

15  anybody that's not speaking to the Court to place their

16  phones on mute.  We are hearing voices in the background.

17          All right.  Mr. Johnston, sorry for the

18  interruption.  You may proceed.

19          MR. JOHNSTON:  Thank you, Your Honor.

20          As we saw, the PHONES noteholders had stopped

21  funding at $3 million and Brown Rudnick, in this agreement,

22  relieved Wilmington Trust of any liability for its fee.  The

23  only way here that Brown Rudnick was going to get paid was

24  through a distribution on the PHONES notes which would

25  trigger the contingency fee.

1    I submit that if Wilmington Trust or the PHONES

2  notes actually had been liable for the fees, they never would

3  have agreed it this higher-up provision.  No person

4  responsible for paying a fee would agree to pay the higher of

5  a lawyer's full hourly rates, (indiscernible) full hourly

6  rates, or a contingency fee.  It just wouldn't happen.

7    Now, absolutely, as you noted, an indenture

8  trustee's fees are generally paid directly from the debtor to

9  the lawyers, but they're paid in respect of obligations of

10  the indenture trustee.

11    Here, we have no obligation of the indenture

12  trustee to pay these fees.  We have a document that said that

13  the lawyer will limit its recovery to what is paid by the

14  noteholders, and the noteholders had cut off funding, or be

15  paid a contingency fee.  In respect of a contingency, that

16  never happened here.

17    I'd note, Your Honor, and we set this out in our

18  brief, Wilmington Trust's own representative Patrick Healy

19  testified that he, himself, viewed the Brown Rudnick amended

20  fee to be no different than the standard, garden-variety

21  contingency fee.

22    So, with that, as we see on the slide, is now

23  Brown Rudnick responded to the cutoff of funding by the

24  PHONES noteholders.  It said, if we can't get paid from the

25  holders, we're going to roll the dice here.  We are going to

1    demand, negotiate a contingency fee and it got it.

2              I'll stop sharing for a moment, Your Honor.

3              THE COURT:  Okay.

4              MR. JOHNSTON:  At around the same time, Mesirow,

5    Wilmington Trust's financial advisor, also cut a new deal.

6    Mesirow went one step further and it actually switched

7    clients, via a completely new engagement agreement that

8    provided for Aurelius, a senior noteholder, to be solely

9    responsible for directing Mesirow and paying its fees.  I'll

10   get to more detail on that switch in a little bit when we

11   focus on Mesirow.

12             For now, the takeaway is that despite Brown

13   Rudnick switching to a contingency fee that never paid off

14   and despite Mesirow switching clients, Wilmington Trust

15   asserts a $31 million claim that includes $21 million of

16   Brown Rudnick hourly fees and $6.15 million in Mesirow fees

17   that were the sole responsibility of Aurelius under a

18   different engagement with a different client.  Those

19   $28 million in fees over and above the $3 million that were

20   funded by the noteholders are not attributable to liability.

21             So, let's look at Wilmington Trust's contract with

22   Tribune, the PHONES indenture, which is the source of the

23   claim here.

24             I'll go back to my demonstrative and we can turn

25   to slide 3.

1          THE COURT:  Slide 3.  I'm there.

2          MR. JOHNSTON:  Okay.  These are excerpts from the

3    indenture itself and the whole indenture, Your Honor, was

4    attached as Exhibit B to my declaration on the docket at

5    13402-3.

6          THE COURT:  I have it.

7          MR. JOHNSTON:  As you can see in Section 6.07, the

8    company, meaning Tribune, agreed to reimburse the trustee,

9    meaning Wilmington Trust, for disbursements and expenses

10   incurred or made by the trustee.  The keywords to keep in

11   mind here are "reimburse" and "incurred" or "made."

12          I'll take this down for now.

13          Here, there's nothing for Tribune to quote,

14   unquote, reimburse, other than $3 million that Wilmington

15   Trust actually paid with the funds provided by the

16   noteholders.  It's undisputed that Wilmington Trust did not

17   go out-of-pocket for any sum and it's undisputed that

18   Wilmington Trust is not liable for any sum over $3 million.

19   It's undisputed that Brown Rudnick's contingent fee never

20   came to pass and it's undisputed that another party,

21   Aurelius, assumed liability for Mesirow's fees.

22          Because there's nothing for Tribune to reimburse,

23   there can be no claim arising under Section 6.07.  As we

24   noted in our brief, the Third Circuit has made clear that a

25   reimbursement obligation arises only where a claimant has

1   incurred and is liable for the sums claimed.  And I'll point

2   you, in particular, to <u>Quick v NLRB</u> at 245 F.3d 231, (3d Cir.

3   2001).  In that case, the Circuit held that there could be no

4   claims for reimbursement of fees under the National Labor

5   Relations Act where the claimant was not liable for the fees

6   of his attorneys.

7           The Circuit held that the plain meaning of the

8   word "reimburse" is to "pay back someone."  If a person has

9   not paid and is not obligated to the liability in the first

10  place, there is nothing to reimburse.

11          As we saw from slide 2, Brown Rudnick expressly

12  disclaimed any Wilmington Trust liability for these fees and

13  Mesirow did the same thing.  So, there's no contractual basis

14  to hold Wilmington Trust liable for the extra $28 million in

15  fees because Wilmington Trust was never liable for them in

16  the first place.

17          So, Wilmington Trust said, Okay, Section 6.07

18  might not be that helpful, but look at Section 5.03.

19          We have that on slide 3, as well.  I'll put that

20  back up.

21      (Pause)

22          MR. JOHNSTON:  So, Section 5.03, Your Honor, is

23  perfectly consistent with Section 6.07.  It simply says that

24  Tribune will pay Wilmington Trust costs and expenses of

25  collection after a default.

1           But Wilmington Trust, here, doesn't have any costs

2    and expenses of collection over the $3 million, because it's

3    not liable for the $28 million balance.

4           The same is true for Section 5.04 of the

5    indenture, which is on the next page.  Wilmington Trust also

6    cited this provision, but Section 5.04 simply allows

7    Wilmington Trust to file a claim for amounts due to it for

8    the reasonable compensation and expenses of (indiscernible)

9    counsel.  All that Section 5.04 is, is an authorizing

10   mechanism for filing a claim for liabilities arising under

11   other parts of the indenture; specifically, Section 6.07 as

12   you can see from the highlighted language at the bottom.

13   There's nothing in Section 5.04 that independently obligates

14   Tribune to pay fees for which Wilmington Trust, itself, is

15   not liable.

16           I'll take this down now.

17           Your Honor, the upshot of all of this is

18   Wilmington Trust's maximum claim is $3 million.  That's the

19   $3 million the professionals were actually paid.

20           As we saw in slide 1, Tribune already paid nearly

21   $1.3 million in respect of that claim.  When you deduct what

22   Tribune paid, you get to a maximum allowed claim of

23   $1.74 million.

24           Okay.  I'm going to move on to point two.  Point

25   two focuses on Mesirow.

1          THE COURT:  Can I ask a question, and I guess a

2  practical question, and it goes to, I think, some of the

3  points raised in the Brown Rudnick response on this issue.

4          Would I be -- if I go with your argument, and I

5  understand, I mean it's -- I understand the argument and it

6  holds together and it's tight, okay -- but would I be

7  potentially changing the law or commercial expectations if I

8  say, Look, you know, if you're not obligated, if you're not

9  on the hook, if you haven't paid it, then the obligee under

10  the, or the borrower under the indenture, doesn't have the

11  obligation to pay for it because -- and part of this is a

12  practical question.

13          I understand what the law is, but my expectation

14  would be that normally when a law firm is engaged to

15  represent an indenture trustee or an agent, et cetera, that

16  agent doesn't place itself directly on the hook for the

17  payment of all of those fees.  The idea is I'm the agent, I'm

18  an indenture trustee.  I don't go out on limbs.

19          I understand how this is drafted, but, you know,

20  the engagement of counsel is on the expectation of payment

21  that will ultimately come through distributions under the

22  indenture or according to its terms.

23          So, is your point that because there was no

24  distribution on the notes, we're done, or is it that because

25  Wilmington Trust did not agree and sign up to say, Brown

1   Rudnick, I will pay you whatever you incur because you're my

2   lawyer and I'm the client and that's the name of the

3   relationship.  That's not consistent with, at least

4   intuitively, how I would understand an indenture trustee

5   engages a law firm because, again, I've dealt with a lot of

6   indenture trustees.  They are not enthusiastic about assuming

7   responsibility.

8           So, I would like your thoughts on that.  And,

9   again, it's not necessarily in the context of this case, but

10  I want -- and, obviously, I'll hear from Brown Rudnick in

11  response, as well -- but I'd like your thoughts just on how

12  this works in the real world and if I come down on this

13  issue, it answers the question, and, you know, I don't mean

14  to be pejorative, it answers an important question in an old,

15  cold case.

16          But the question would be, you know, if the Court

17  adopts this position, do indenture trustees, or actually more

18  importantly, lawyers engaged by indenture trustees, in

19  particular, have to say, Look, I need you to tell me that

20  you're on the hook, and I need you to commit that regardless

21  of what happens, you will pay, because if you're not on the

22  hook, I'm not going to get paid.

23          Am I overstating the argument?

24          I'd like, you know, kind of the benefit of your

25  perspective on this.

1          MR. JOHNSTON:  Yes.  And that is not our position,

2     Your Honor.  And I think you stated the commercial practice

3     well.  We've represented indenture trustees in the past all

4     the time and what you sign up for is, you're not going to

5     look to the indenture trustee to come out-of-pocket to pay

6     the fees.

7          What you are going to do is say, Indenture

8     trustee, we expect you to exercise your charging lien on

9     distributions from the estate and that is how we will get

10    paid.

11          What makes this case different is you have an

12    indenture trustee in respect of a subordinated note position

13    that everyone knew was not going to recover a dollar in the

14    case unless there was a litigation homerun success.

15          THE COURT:  So, wait just one second.

16          I get that, but move this to today, sort of in the

17    marketplace, and, again, I know I'm cutting you off.  I gave

18    you a longer question than this, but I'm adding to it.  So,

19    move this to today and we often have first liens and second

20    liens in a capital structure.

21          You know, the PHONES notes maybe, from your point

22    of view, create an easier fact pattern for me to make that

23    ruling where, you know, from your briefing, it was clear

24    very, very early in the case that from the debtors' point of

25    view the PHONES notes were demonstrably subordinated way out

1    of the money and needed, you know, a grand slam of a homerun

2    to get anything, okay, and that probably helps your fact

3    pattern here.  But it wouldn't surprise me if you got a phone

4    call to represent the indenture of, you know, the second lien

5    notes and a retailer and you'd engage and, ultimately, the

6    company goes up for sale and sales process is worse than

7    anybody expects.

8            If I rule in your favor, how does that change how

9    you would have to engage, because there wouldn't be a

10   distribution.  Let's say the sale leads to first underwater.

11   You know, we've seen a lot of oil and gas cases, stuff like

12   that.  It's not an anomalous fact pattern.

13           So, I'm concerned -- and maybe this isn't fair

14   because it's a broader inquiry, but I have the luxury of

15   having counsel that have done this kind of thing for many,

16   many years, so I'm concerned about dealing with a narrow

17   issue that people will look at and I'm going to wind up on

18   the cover of the ABI Journal.

19           MR. JOHNSTON:  No, I don't have a problem taking

20   it broader, Your Honor.  Under your hypothetical, the

21   question is whether counsel out-of-the-money second liens

22   addition can look to the debtor for payment of fees, where

23   the second lien position has gotten nothing.

24           And I would submit in that case, unless the debtor

25   has independently obligated itself to pay those fees, that's

1 the correct result and I don't think that's a C.J. & J market

2 practice at all.  The professionals --

3                THE COURT:  So, let me ask another question then.

4                Do we create -- there are a lot of anomalous

5 results or anomalous circumstances in this case, but do we

6 create a situation where what if for reasons that are not

7 consistent with anybody's experience, the indenture trustee

8 says, Mr. Johnston, we need your firm, we need you onboard.

9 We're the seconds and you need to guide us through this

10 bankruptcy, and we will pay your fees.

11                And then the fact pattern plays out as I just

12 said, we sell the retailer, or the ENP company or whatever

13 and the firsts are way underwater.  At that point, the

14 indenture trustee is obliged to pay your fees.  There is no

15 distribution to the noteholders.  But I think in that

16 circumstance, the debtors would have to pay for the fees of

17 the out-of-the-money claimants.  Would that be correct?

18                That's not our facts here, or at least not as you

19 played them out, but could we end up in that anomalous

20 situation?

21                MR. JOHNSTON:  The only way in which the debtor

22 would be liable to pay those fees would be if the credit

23 agreement or the indenture provided for that obligation and

24 that is not our facts here.  For the reasons that I went

25 through, this indenture did not provide that independent

1   obligation on Tribune to pay the fee.

2           I will say, Your Honor --

3           THE COURT:  But I think my fact pattern was --

4   this is an interesting question and I understand the bid and

5   the ask in the briefing, but, again, back to my sort of 2020

6   fact pattern, if indeed, the indenture trustee said,

7   Mr. Johnston, we'll pay Jones Day's fees and you do the work

8   and you incur a million dollars and you work the case and the

9   sale comes through low and your clients are out of the money

10  and there's no changing the math and there's, you know, no

11  different result, the indenture trustee is, at that point, on

12  your engagement letter, is obliged to pay your fees in

13  connection with your representation of the indenture trustee

14  on behalf of the noteholders, the seconds.

15          In that fact pattern, which, again, I understand

16  is not necessarily our fact pattern today, but would we have

17  a situation where the debtor would be obliged?

18          Because the provisions you've described here that

19  are laid out are not unusual, all right.  I mean, this is not

20  a unique document here where you'd say, you know, every other

21  indenture or every other agreement has this.  This one

22  doesn't.  This is not that situation.  This is, to me, pretty

23  industry-standard stuff.

24          So, I'm just asking about the consequence.  If the

25  indenture trustee hired you and let's go a step further, and

1 paid your million-dollar fee, would they be able to turn to

2 the debtor and say, We realize that we represented an out-of-

3 the-money constituency, et cetera, and there's no

4 distribution and no charging lien, nothing to charge against,

5 but, debtor, the indenture or the agreement that you signed

6 with us said you're going to pay for the -- you're going to

7 reimburse us for the fees that we incurred, leave aside

8 reasonableness.

9         I think they'd have to do that, wouldn't they?

10         MR. JOHNSTON:  Yes, absolutely.

11         THE COURT:  Okay.

12         MR. JOHNSTON:  If the documents were as these

13 documents were, they would.

14         THE COURT:  Okay.

15         MR. JOHNSTON:  But what happens, as a practical

16 matter, Your Honor, and we see this in this case, is that the

17 professionals protect themselves.

18         What happened here?  The case filed, Brown Rudnick

19 was on an hourly fee.  As we'll see, Mesirow agreed to a very

20 limited fee.  Holders agreed to put up a little bit of money

21 to see where things would go.

22         The holders then cut off this payment.  What did

23 the professionals do?  They protected themselves.  They went

24 for a contingency fee and they went to other parties to pay

25 their fees.  That's what happens in the real world and that's

1  what happened here.  What's unusual here is that you now have

2  the indenture trustee for an out-of-the-money constituency

3  coming back to the debtor and saying, well, pay us anyway.

4  And it is notable, Your Honor, that Mr. Healy, the

5  Wilmington Trust representative, testified that he had never

6  hired a professional on terms similar to those with Brown

7  Rudnick in this case.  You can see that in his deposition

8  transcript, which was submitted on page 75.  These were not

9  market standard terms and Wilmington Trust cites no market

10  practice that would support them.

11  THE COURT:  Okay.

12  MR. JOHNSTON:  Okay.  Moving on to Mesirow, which

13  is related, but distinct at the same time.  A huge part of

14  this claim, $7.5 million are fees of financial advisor

15  Mesirow.  Almost two-thirds of those fees, $4.9 million came

16  after December of 2010 when Mesirow was working for senior

17  noteholder Aurelius and not Wilmington Trust, and I've got a

18  couple of slides that demonstrate that.

19  If you want to put it up, we can turn to slide 5.

20  THE COURT:  Okay.

21  MR. JOHNSTON:  Slide 5 details the evolution of

22  Mesirow's role in the Tribune bankruptcy.  Here, we have

23  excerpts of three successive Mesirow engagement agreements,

24  okay.  You can find full copies of these as Exhibits D

25  through F of my declaration, Docket Numbers 13402-7

1  through 9.

2         At the top is Mesirow's engagement letter, dated

3  February 2, 2010, with Brown Rudnick.  This is shortly after

4  the petition date and, as you can see from the highlighted

5  language, Mesirow agreed to limit its fee to a maximum of

6  $100,000.  Simple, straightforward, again, reflective of the

7  fact that people didn't know about the PHONES.  The PHONES

8  looked like they were probably out of the money.

9         In the middle, you have an amended engagement

10  letter from a few months later, April 26th.  Here, Mesirow

11  agreed that its fee would be limited to amounts received from

12  the two PHONES noteholders who had agreed to pay the

13  $3 million of Wilmington Trust's expenses.  Those noteholders

14  countersigned this letter and as you can see from the

15  highlighted text at the bottom, they expressly agreed to

16  assume the responsibility for Mesirow's fees.

17         Things changed drastically later that year in

18  December of 2010.  At that time, which was shortly after

19  Brown Rudnick switched to its contingency fee, Mesirow

20  executed an entirely new agreement.  This agreement not only

21  was with Brown Rudnick, but it was with counsel to Aurelius,

22  a senior noteholder and counsel to the two indenture trustees

23  for the senior noteholders.

24         As you can see from the passage at the bottom,

25  this new agreement did a couple of things.  First, it was

1   Aurelius and Aurelius alone who agreed to be solely

2   responsible for Mesirow's fees starting in December 2010 and

3   Aurelius, not Wilmington Trust, not PHONES noteholders,

4   agreed to pay Mesirow an additional $1.25 million in fees

5   relating to the pre-December 2010 period when Mesirow was

6   nominally working for Wilmington Trust.  That's the "initial

7   work fee" referenced at the top.

8           I'll stop sharing for a moment.

9           All told, Your Honor, that is $6.15 million in

10  Mesirow fees that Wilmington Trust did not pay, was not

11  liable for, and did not incur.  For the reasons we've been

12  through, I'd submit that none of that can be part of

13  Wilmington Trust's claim for reimbursement under the

14  indenture.

15          Independently, even if those fees actually had

16  been Wilmington Trust's liabilities, they would not be

17  reimbursable by Tribune under the indenture.

18          So, let's turn back to slide 3.  I don't need to

19  put it up, but you can see from Section 6.07 of the indenture

20  that Tribune agreed to reimburse Wilmington Trust for the

21  fees of its "agents and counsel."  Sections 5.04 and 5.03 use

22  the same language.  Mesirow was not Wilmington Trust's

23  counsel, obviously, and Mesirow's engagement agreements with

24  Wilmington Trust specifically disclaimed any agency

25  relationship.

1    I'll put up my last slide and this will probably

2  be the last time I do it.  It's page 6.  Here, you can see

3  from the passage at the top that from the very beginning,

4  Mesirow said that it was not going to be the agent of

5  Wilmington Trust and vice-versa.

6    The passage below was from that December 2010

7  engagement agreement with Aurelius and it goes even further.

8  It says that Mesirow does not establish any client

9  relationship with any of the co-plan proponents, which

10  includes Wilmington Trust, and that Mesirow shall not take

11  direction or instruction from any of the co-plan proponents,

12  again, including Wilmington Trust.

13    So, starting in December 2010, we have an

14  agreement where Mesirow said it will take no direction or

15  instruction from Wilmington Trust.  That is the antithesis of

16  an agency relationship and I'd submit that Wilmington Trust

17  cannot possibly have a claim for $7.5 million of a

18  professional that it could not even give direction to.

19    Okay.  I'll take this down.

20    I'll move on to point three, Your Honor, which is

21  much more fact-based and the part where you are certainly at

22  the biggest disadvantage here.  Our point three is that these

23  fees are not reasonable even if they are or otherwise would

24  be reimbursable under the indenture.

25    THE COURT:  Can I ask a context question?

1           MR. JOHNSTON:  Yeah.

2           THE COURT:  The U.S. Trustee objected, I believe,

3    and you've cited to their papers and their concerns with

4    respect to the sufficiency or the non-compliance with the

5    Local Rules in terms of fee applications and time

6    descriptions and (indiscernible) et cetera.  I get that.

7           Was there a fee auditor that went through the

8    Brown Rudnick application or was this a process that was done

9    by the debtors and by WTC or by the debtor and the U.S.

10   Trustee?

11          MR. JOHNSTON:  There was no fee auditor, Your

12   Honor, and that's unfortunate that the scope of the fee

13   auditor in the case was for professionals employed at the

14   expense of the estate.

15          THE COURT:  Right.  That I understand.

16          MR. JOHNSTON:  And the U.S. Trustee objection,

17   which I'll touch on in a minute, arose in the context of the

18   Wilmington Trust substantial contribution claim.  So, that

19   was when the U.S. came in and said, we don't think there was

20   a substantial contribution, but even if there was, look at

21   these time records, they're a mess and you can't possibly

22   determine that a contribution has been made.

23          So, that leaves us and you in the unenviable

24   position of looking at literally thousands of time records

25   here to try to assess reasonableness.  I'm going to try to

1  help you cut through some of that with some basic points.

2          And as we go through the points on reasonableness,

3  I'd like you to keep in mind two facts that are undisputed

4  that I think help put things in context and go a long way

5  toward making our point here.  Fact number one is it is

6  undisputed that PHONES notes were subordinated, and they

7  would not recover anything until the Tribune LBO debt was

8  avoided.  Judge Carey knew this.  The senior creditors knew

9  it.  Wilmington Trust knew it.  And the PHONES noteholders

10 knew it.  And that's how the case played out.  Holders of the

11 PHONES notes received nothing on their claims as we saw from

12 slide one.

13         Fact number two is that creditors senior to the

14 PHONES notes, especially the $1.2 billion in senior notes,

15 were motivated to investigate the Tribune LBO whether or not

16 Wilmington Trust did anything.  Those creditors stood to

17 recover pennies on the dollar unless they achieved avoidance

18 success in those claims.

19         As a result, the secured creditors mounted a

20 vigorous challenge to the LBO.  The LBO claims were going to

21 be investigated and pursued regardless of what Wilmington

22 Trust did or did not do.  As a result, Wilmington Trust's

23 role in the case was or should have been minor and given that

24 minor role, it was objectively unreasonable for Wilmington

25 Trust to run up more than $31 million in professional fees

1  during the case.

2          THE COURT:  Let me ask you to respond, if you

3  will, to the position raised by Wilmington Trust, which is,

4  you know, it's not that comforting to be a deeply junior

5  creditor and have a senior creditor investigating potential

6  claims because if that senior creditor is owed a million

7  dollars, those claims are not likely to settle for more than

8  a million dollars and that's kind of a colloquial way to put

9  it.

10          But I think their point was we were going to get

11  settled out if we weren't at the table or engaged and how do

12  you -- I mean, look, I understand the dynamic that you're

13  describing and I am at somewhat of a disadvantage, but I

14  think I'm up to speed on that but there's -- you know, what's

15  the line?

16          Because your suggestion is not short of saying,

17  You guys should have given up.  And, you know, you've seen

18  the response to that.  I'd like your answer to that context,

19  because I get the argument.

20          MR. JOHNSTON:  It's a fair question, Your Honor,

21  and I will respond with a colloquialism of my own and then

22  walk through a couple of points of the law that I think help

23  you identify where the line is.

24          I would say, one, you can't get blood from a

25  turnip, right.  So, yes, the subordinated creditor will feel

1  uneasy relying exclusively on the senior creditor to do all

2  the legwork.  At the same time, the subordinated creditor has

3  to have some economic reality check to its activities.  It

4  can't swing for defenses with very, very little hope of

5  recovery and then expect for the debtor and, frankly, all of

6  the creditors of the estate to foot the bill for that.

7        And I think standards courts have established in

8  other contexts, kind of confirm a common sense proposition

9  that there has to be a reality check on what an out-of-the-

10  money creditor, reputed out-of-the-money creditor can do in

11  the case.

12        I'll start first with an observation by the

13  Seventh Circuit in the Medcom case which was applying

14  Illinois law, which is applicable under the PHONES indenture

15  here.  In that case, Judge Easterbrook in his (indiscernible)

16  way, held that:

17        "When a Court is asked to compel one litigant to

18  pay fees that the other litigant, itself, has not paid, which

19  is our facts, it's the Court's responsibility to quote, guard

20  against moral hazard the tendency to take additional risks or

21  run up extra costs if someone else pays the tab."

22        Judge Easterbrook held that:

23        "Pie-in-the-sky numbers that one litigant seeks to

24  collect from a stranger, but would never dream of paying

25  itself, are not reasonable. "

1              And that's <u>Medcom Holdings v Baxter Travenol</u>, 200

2    F.3d 518 520, 521 (7th Cir. 1999).

3              Those are our facts, Your Honor.  We have

4    Wilmington Trust trying to collect $28 million in fees that

5    it hasn't paid, it isn't liable for, and that no one has

6    paid, and no one is liable for.  The moral hazard is clear

7    and unambiguous.

8              Another good reference point that hits a little

9    closer to home is the standard applicable to a secured

10   creditor seeking fees under Section 506(b) of the Bankruptcy

11   Code.  Courts have held that under Section 506(b), we look to

12   the "economics of the situation" to determine the

13   reasonableness of fees claimed by a secured creditor in

14   protecting its collateral.

15             The <u>Kroh Bros.</u> case is kind of the leading case in

16   this regard, we cited in our brief.  And it makes the point

17   that applies really well here.  The Court held that:

18             "It is inherently unreasonable to seek

19   reimbursement for fees that are not cost justified either by

20   the economics of the situation or necessary to preservation

21   of the creditor's interest in light of the legal issues

22   involved."

23             That is <u>In re Kroh Bros.</u>, 105 B.R. 515, 520-521

24   (Bankr. W.D.Mo. 1989).

25             In this case, and we've tried hard to make this

1   point, the economics of this situation were that the PHONES

2   notes were subordinated to all material debt of an insolvent

3   lender and under the facts as they were presented, everyone

4   knew that the PHONES notes wouldn't receive distribution,

5   absent a litigation homerun.  In litigation that, was being

6   pursued by motivated in the money creditors.

7          Wilmington Trust's fees are not justified by the

8   economics of the situation because no rational creditor would

9   have incurred the fees, given the slim chance of obtaining

10  any recovery.  And to the use the words of the Kroh Bros.'

11  Court, the fees here were not necessary to preservation of

12  Wilmington Trust's interests in light of the legal issues

13  involved.

14          The last legal touchpoint I would point you to is

15  the prudent-person standard applicable to the (indiscernible)

16  of indenture trustees, generally.  As Judge Walrath held in

17  the Worldwide Direct case:

18          "An indenture trustee is required to act with the

19  same care as if it owned the investments."

20          In re Worldwide Direct, 334 B.R. 112, 129 (2005)

21          No one who owned the PHONES notes would have paid

22  $31 million for the servitudes for which Wilmington Trust now

23  asserts a claim.  The fact that we have a perfect data point,

24  we know that the actual PHONES noteholders pulled the plug

25  after $3 million; less than a tenth of what Wilmington Trust

1  now claims.  That is compelling evidence.

2          All of this, we submit, Your Honor, makes it clear

3  that an out-of-the-money creditor is not free to run up the

4  bill if it believes that it has nothing to lose and someone

5  else will pay it.  That is the broad-brush strokes of where

6  you draw the line, as you put it.  But in this case, that is

7  exactly what Wilmington Trust did.

8          In Exhibit A to our brief, we summarize some of

9  the most egregiously wasteful and unproductive activities for

10  which Wilmington Trust now asserts a claim.  They include co-

11  prosecution of a plan that was rejected by 240 out of 243

12  voting classes and denied confirmation by Judge Carey;

13  objections to what was a broadly supported settlement of the

14  LBO avoidance claim; pursuant of two patently frivolous

15  interlocutory appeals; and the filing of a frivolous

16  objection to Tribune's emergence from bankruptcy with the

17  Federal Communications Commission, raising points that would

18  have been equally applicable to the plan that Wilmington

19  Trust, itself, was prosecuting; and, frankly, massive

20  overbilling, in general, including months with up to 76

21  timekeepers investigating the LBO that was under

22  investigation by many other stakeholders.

23          We submit that none of the fees associated with

24  those efforts were reasonable.  Our reasonable objection we

25  filed long ago went through various categories of fees and

1  services in pretty great detail explaining why --

2          THE COURT:  I (indiscernible) that.

3          MR. JOHNSTON:  -- yeah, explaining why the --

4  thank you -- why the fees were inflated or reasonable.  That

5  says it much better than I could do today.

6          Last point on reasonableness.  If you set all of

7  this aside, we also have the basis fact, as you noted

8  earlier, that it's really not possible to determine whether

9  any of the claimed fees are reasonable because the submitted

10  time records are so inadequate.  The Brown Rudnick time

11  entries are so lumped and vague that the U.S. Trustee

12  described them as:

13          "Astounding, particularly for a firm which holds

14  itself out as an experienced bankruptcy professional in

15  complex cases such as this."

16          The U.S. Trustee said that virtually every page of

17  the Brown Rudnick time sheets contained lump entries and I

18  quote:

19          "Notwithstanding extensive bankruptcy experience

20  that Brown Rudnick's time and expense submissions have failed

21  to comply with applicable rules and guidelines."

22          I think Your Honor found it already, but you can

23  see that at Docket Number 13443, paragraphs 14 and 53 to 57.

24          But as bad as that is, it's even worse for Mesirow

25  which submitted no time records whatsoever for services

1  rendered after August 2010, a period to which Wilmington

2  Trust asserts a claim of more than $5 million.  I would

3  venture to guess that Your Honor has never been asked to

4  order a debtor to pay $5 million in hourly fees, and these

5  were hourly fees, to an advisor who fails to submit any time

6  records at all.  All of this makes it impossible to assess

7  the reasonableness of the requested fees and it makes the

8  basic touchstones for reasonableness that I went through all

9  the more important.

10          At the end of the day, the burden is on the

11  claimant to establish reasonableness and we'd submit that

12  Wilmington Trust has failed to do so.

13          Last point, Your Honor, very briefly.  You'll note

14  that Wilmington Trust is seeking more than $1 million in fees

15  for litigating over its fee claim, itself, after -- incurred

16  after the effective date of the plan on December 31, 2012.

17  There's no basis for any claim for those fees,

18  notwithstanding how you ruled on the rest of this.

19          Under Section 1141 of the Bankruptcy Code and

20  Section 11.1.1 of the confirmed plan, all prepetition claims,

21  including claims under the PHONES indenture have been

22  discharged.  There is no contractual right following the

23  effective date to a claim under the PHONES indenture and this

24  portion of the Wilmington Trust claim must be disallowed.

25          I'd note from Wilmington Trust's brief and its

1  PowerPoint this morning, it is arguing that somehow the

2  scheduling stipulation we'd agreed to pre-effective date for

3  litigation of this claim, preserved and effectively gave

4  Wilmington Trust the right to assert this claim for fees.

5  That stipulation was strictly procedural.  It didn't give

6  Wilmington Trust any greater rights than it had under the

7  plan.  And, as we noted, the plan discharged all liability

8  post-effective date.

9            So, Your Honor, that's my presentation this

10  morning.  I'm happy to answer any questions you might have.

11            THE COURT:  No, I don't have any questions at this

12  point.

13            What I think we'll do if it's okay with everybody,

14  is we'll take a 10-minute break right now and so we'll just

15  leave the lines open and cameras live, and then we'll

16  reconvene.

17            It is, by my calendar, it is 11:00 a.m., so we'll

18  just reconvene at 11:10 a.m. eastern time and I'll hear from

19  Brown Rudnick and WTC.

20            I would ask, there is no other party arguing that

21  expects to participate in today's papers?

22            I can identify everybody I see on the screen.  I

23  just don't want any surprises at the end.

24            Okay.  So, we'll reconvene in 10 minutes with

25  responses.  Okay?

1           MR. JOHNSTON:  Thank you, Your Honor.

2           THE COURT:  Great.  Thanks for your patience.

3           Just leave the lines open, I think.

4           THE CLERK:  Thank you, Your Honor.

5      (Recess taken at 11:00 a.m.)

6      (Proceedings resumed at 11:10 a.m.)

7           THE COURT:  And we are back on the record.

8           We have heard from the reorganized debtor and now

9    we will hear from counsel for WTC from Brown Rudnick.

10           UNIDENTIFIED:  Thank you, Your Honor.

11           MR. SULLIVAN:  Your Honor, Bill Sullivan.

12           Briefly, Your Honor, can we be sure that

13   Ms. Dwoskin has co-host rights for the PowerPoint

14   presentation.

15           THE COURT:  Yes.

16           LaCrisha, does Ms. Dwoskin have host rights?

17           THE CLERK:  Your Honor, I'm switching it now.

18           THE COURT:  Okay.  Great.

19           MR. SULLIVAN:  Thank you, Your Honor.

20           MS. DWOSKIN:  Thank you, Your Honor.

21           This is Sheri Dwoskin from Brown Rudnick.  I'm

22   also still waiting for my colleague, Jim Stoll.

23           THE COURT:  Oh, okay.

24           MS. STICKLES:  Your Honor, my apologies, Kate

25   Stickles.

1             Mr. Johnston is having difficulties with

2    CourtCall, as well.

3             THE COURT:  Okay.

4             MR. STOLL:  Can I not be heard?

5             MR. JOHNSTON:  Jim, your video is not showing.

6             THE COURT:  I do not have Mr. Stoll.

7             MR. STOLL:  I'm here now.

8             Am I here?

9             THE COURT:  Mr. Stoll, is that you?

10            MR. STOLL:  I hope so.  Here I am.

11            THE COURT:  I do not have you on video, sir.  Oh,

12   hang on.

13            No, I have Mr. Cicero, I have Ms. Dwoskin, but I

14   do not have Mr. Stoll.

15            MR. STOLL:  I see myself on the screen.

16            THE COURT:  Yeah, there you are.  We've got you

17   now.

18            MS. STICKLES:  Excuse me, Your Honor?

19            THE COURT:  Yes, ma'am?

20            MS. STICKLES:  Your Honor, could you check that

21   Mr. Johnston is on CourtCall, as well?

22            THE COURT:  Operator, this is Judge Shannon.

23            Do you have Mr. Johnston on the line?

24            THE OPERATOR:  He had disconnected, but has just

25   now connected, yes.

1                THE COURT:  Mr. Johnston, you're back in?

2                MR. JOHNSTON:  Yes, Your Honor.  Yes, I am.  It's

3     not my day for technology, I guess.

4                THE COURT:  That's all right.

5                MS. STICKLES:  Thank you, Your Honor.

6                THE COURT:  Thank you very much.

7                And thank you, Operator.

8                All right.  So, before we get going, I would,

9     again, remind everybody that if you're not speaking to the

10    Court, please place your phone on mute.

11               And Mr. Stoll, good afternoon -- or it's still

12    morning -- good morning.  And are you ready to proceed?

13               MR. STOLL:  I am, Your Honor.  Thank you very

14    much.

15               THE COURT:  Great.

16               MR. STOLL:  For the record, Your Honor, James

17    Stoll from Brown Rudnick on behalf of Wilmington Trust

18    Company.

19               So, I put together a slide presentation, Your

20    Honor, to just walk us through the points that I want to

21    make; hopefully, it will be helpful.

22               Shari, can you just turn to slide 1.

23               So, just at the outset, Your Honor, we just wanted

24    to make the point that this is a contractual claim for an

25    unsecured claim that the parties have agreed to engage in,

1  pursuant to the specific Section 3.2.6 of the confirmed plan

2  of reorganization.  It's not a fee application under 506 or

3  under any other Bankruptcy Code section.

4          And we raise that point only because some of the

5  issues and assertions of the debilitating time entries are

6  really, I think, overstated when you look at the issue from

7  the state law standpoint.  And so, I'll just leave that there

8  for a moment.

9          But this a request for an unsecured claim under

10  the plan, as provided.

11          Go to slide 2, Shari.

12          So, slide 2 is just a restatement of the remand

13  issues that the parties have agreed to, Your Honor, and we

14  will go through those one by one.  But I first wanted to give

15  a little background and just also talk about the claim just

16  are a little differently than Mr. Johnston did a moment ago.

17          So, Shari, could you go to slide 4.

18          So, this is the claim as originally filed and then

19  amended for the fees incurred in prosecuting the claim, and

20  then the reduction from the total amount of the claim of the

21  amount paid to Wilmington as a committee member, the $763,000

22  amount, and the amount that was allowed by the mediator and

23  approved by the Court, of the substantial contribution claim

24  for Wilmington's role in securing the appointment of the

25  examiner in that examination process.

1           The reason we put them up here, Your Honor, you

2   see we deduct those from the claim to get to the net amount

3   of the claim.  The reason for highlighting it here though is

4   to say that contrary to the debtors' position, we do not

5   believe that the amounts that were paid for either the

6   committee claim, or the substantial contribution claim should

7   ultimately be deducted from whatever claim is allowed by His

8   Honor.

9           The time associated with those claims is what

10  we're deducting here so there's not double-counting of that

11  time between the unsecured claim and the administrative

12  claims.  Those other claims were administrative claims

13  already allowed and paid and the time that relates to them,

14  because they were dollar-for-dollar claims, has simply been

15  removed from the dollar amount of these claims.  But we do

16  not think it ultimately should be a net deduction.

17          THE COURT:  Okay.  I understand.

18          MR. STOLL:  Okay.  So, Your Honor, on the next

19  slide, and this is just sort of an index for you that I hope

20  you'll find helpful when you sit back and look to whatever

21  degree you choose to look, at the time details that was

22  submitted.  This is attached to Mr. Stark's declaration,

23  which is Tab 6(c) in your binder, are the full time records

24  for Brown Rudnick as they were submitted to the debtor and to

25  you.

1          The time was billed during the course of the case,

2  pursuant to six separate billing numbers and descriptions and

3  what's on the far left side is the dates range of the time

4  sheets with respect to each of those billing numbers.  And

5  hopefully that will be helpful to the extent that you spend

6  some time with these time sheets, because they are

7  voluminous, and it can be so hard to find things and

8  sometimes it can look like --

9          THE COURT:  I appreciate that.

10          MR. STOLL:  -- they're starting all over again.

11          THE COURT:  Okay.

12          MR. STOLL:  So, the next slide, Your Honor, this

13  is a graphic that we prepared from publicly available

14  document information in the case, which is designed to put

15  our fee claim into a little bit of context.  First of all,

16  there's no denying the fee claim is large, very large, and we

17  acknowledge that we don't run away from that.

18          But it's in the context of a spectacularly large,

19  complex, and hugely expensive case.  For those, just those

20  professionals that represented the debtors or the committee

21  or the LBO creditors who were targets of the fraudulent

22  transfer claims, and the ones who either had filed their fees

23  on the docket or otherwise had their fee information made

24  known to the parties, those collective parties billed and

25  were paid at 100 cent dollars over $385 million during the

1   course of the case.

2          That doesn't justify our fee, but it puts it in

3   context when you look to reasonableness and why and how could

4   it cost so much to do certain things.  You know, it's, in

5   large measure, a function of the enormity of the case, the

6   complexity of the case, and the numerous parties and the

7   aggressiveness of the parties.  So, I think that's some

8   useful background.

9          Next slide, Shari.

10          This is, Your Honor, these next two couple of

11   slides is just a little reminder background, I guess, on the

12   LBO and what happened to the company.  I know you probably

13   know most of this --

14          THE COURT:  I do.

15          MR. STOLL:  -- and I won't belabor it, but the

16   only point I'm trying to show here is before the LBO, the

17   company had a debt structure of approximately $5 billion,

18   almost equally divided between the secured debt and unsecured

19   debt, the PHONES notes being part of that unsecured debt, and

20   the company had a value far in excess of that debt.

21          Next slide, Shari.

22          Once the LBO was effectuated in the two-step

23   transaction that you're undoubtedly familiar with, an

24   additional amount of debt, net amount of debt was ultimately

25   layered on top of the company in the approximate amount of

1  $11 million.  And just looking at the selling shareholders

2  alone, over $8 billion was sent out the door to those selling

3  shareholders in the two-step transaction and additional

4  hundreds of millions of dollars were paid in fees and

5  expenses to the LBO creditors.  And those are, ultimately,

6  what the source is of the fraudulent transfer claims that

7  left the company insolvent.

8           Next slide, Shari.

9           And so, when it was all said and done, now,

10  suddenly where the PHONES notes previously had $2 and a half

11  billion of debt in front of it, secured debt, now there was

12  $11 billion or $10 billion of secured debt and then of course

13  the student notes.  So, that's sort of how we got here.

14           And, of course, I'm sure Your Honor knows how

15  notorious the deal was at the time that it was happening, the

16  public reaction to it from people who were following it, the

17  expectation for what it might do to the company and, in fact,

18  the reality that within less than a year of closing the

19  second part of that deal, the company had to file for

20  bankruptcy because it doesn't sustain itself.

21           So, next slide.

22           Okay.  So, at any rate, Wilmington Trust is a

23  member of the creditors' committee and for the better part of

24  the first year of the case, Wilmington Trust, you know,

25  billed on average, about $30,000 a month as a committee

1 member and it watched and paid attention to what

2 investigation the creditors' committee was engaged in, what

3 work was being done by the senior lenders, and observing the

4 dynamic and looking to see how and if the fraudulent transfer

5 claims were going to be adjudicated or investigated and then

6 preserved for the benefit of the entire credit body.

7 　　　　　And I think it's undisputed that the central, you

8 know, component of this bankruptcy throughout its life was

9 the fate of these fraudulent transfer claims.

10 　　　　　So, up on slide 10 is some excerpts from

11 Mr. Zensky declaration in which he simply acknowledges that,

12 yeah, we thought all along, Wilmington Trust thought all

13 along that these fraudulent transfer claims were significant

14 and would yield a meaningful recovery for all creditors,

15 including the PHONES.

16 　　　　　The other piece that I think is important for Your

17 Honor to remember is that the creditors' committee consisted

18 not only of unsecured creditors, but also of several

19 creditors who were the LBO creditors who were, ultimately,

20 some of the main targets of the fraudulent transfer claims.

21 　　　　　And so all along, there was a concern by the

22 unsecured creditors, the primarily the senior notes and the

23 PHONES notes that there would be a lot of pressure brought on

24 the committee and a lot of influence to settle these claims

25 out for not meaningful consideration.

1          And, indeed, throughout this early process,

2  everyone except for everyone on the committee repeatedly made

3  the point to the PHONES that you're subordinated, your views

4  don't count, and we're not going to spend any time listening

5  to your issues.

6          So, then as we go into the beginning of 2010, it

7  becomes apparent that, in fact, the case is moving towards

8  settlement and that the investigations are not proceeding

9  significantly after that.  And at that point, Wilmington

10  Trust decides that these claims are so valuable, it can't

11  simply allow them to be pushed aside or settled out from

12  under for little or no consideration.  And so that's when

13  Wilmington Trust and two of the noteholders who held

14  approximately 50 percent of the outstanding PHONES notes,

15  authorized and directed Brown Rudnick to begin its own

16  investigation.  And that led, from January through -- into

17  March, Brown Rudnick to do a lot of things, including

18  analyze, I mean millions, literally millions of pages of

19  documents that had been produced.

20          It led it to prepare an equitable subordination

21  claim against some of the senior lenders.  It led it to

22  ultimately seek an examiner, as it was excluded from the

23  meetings by the committee because it was beginning to engage

24  in these kinds of activities to determine what the value and

25  the likelihood of success these claims could yield.  And

1  you'll see that and slide 11 and the excerpts from

2  Mr. Zensky's declaration, which is Tab 6(d) of your binder

3  and 6(c) for Mr. Stark's declaration.

4         In any event, as it turns out, the fears of

5  (indiscernible) were justified because, in fact, a settlement

6  was reached in which, aside from the senior lenders and the

7  debtor, the creditors' committee and the senior noteholders

8  all agreed to a settlement that then found its way to the

9  first proposed plan and that settlement divvied up the equity

10  in the company to those various constituents and it otherwise

11  released all the relevant parties that it could release and

12  did not set up a trust and did not have any cash

13  contributions and, certainly, did not provide any recovery

14  for the PHONES.

15         So that led to the -- that was all happening and,

16  again, Wilmington Trust and its counsel understood that

17  that's what was coming, and so that led Wilmington Trust to

18  move for the appointment of an examiner so that it could

19  ultimately, if the judge allowed that, have an independent

20  party who would look at these claims and make assessments as

21  to their viability so that that would then be the kind of

22  clarity and the kind of transparency that makes for a fair

23  and, hopefully, for the PHONES somewhat remunerative plan.

24         Everyone opposed, every one of the parties who had

25  settled opposed Wilmington Trust's request for an examiner.

1  Ultimately, a hearing was scheduled at the time in early

2  April, and it was supposed to be an evidentiary hearing but

3  at the outset after some preliminary remarks by a variety of

4  parties, Judge Carey expressed his views softly that it was

5  likely that an examiner ought to be appointed in this case in

6  order to facilitate those issues that I just discussed:

7  transparency and clarity about what the potential claims

8  were.

9          And he had sent the parties off to talk amongst

10  themselves about the appropriate way to, or the process that

11  they wanted to engage in and to come back to him in a couple

12  of weeks.  The parties did that and ultimately agreed to the

13  appointment of an examiner, and that was Mr. Klee.  That

14  takes us through the end of April of 2010.

15          And then in May of 2010, at the request of

16  Professor Klee, a deadline was set up, May 24th for the

17  submission of three things by all parties.  He decided to

18  conduct a quasi-adversarial process in which he asked all the

19  parties who cared are to participate, to submit three things

20  that explained their views on the fraudulent transfer claims,

21  their viability defenses, those sorts of things.  He actually

22  authorized Brown Rudnick, on behalf of Wilmington Trust, to

23  file a brief of 100 pages because it was the only party that

24  was advocating for the fraudulent transfer claims to be

25  retained and not settled.

1          You'll see in Tab 6(a) of your binder, which is

2    our original briefing, 6(a)(1), Exhibit 1 is the draft brief

3    that was sent by Brown Rudnick to the debtors at the

4    beginning of our stipulated fee process, which included,

5    itself, a whole series of exhibits that explained to the

6    debtor our fees and how we got from here to there.  And in

7    that particular file, 6(a)(1), Exhibit M, is a compilation of

8    the briefs that were submitted by all the parties -- not all

9    the parties, excuse me -- by Brown Rudnick on behalf of

10   Wilmington Trust, the senior noteholders, and the creditors'

11   committee.

12         And the senior noteholders and the creditors'

13   committee's briefs are included in there because even though

14   they acknowledged that there were substantial fraudulent

15   transfer claims and even though the dollar amount of those

16   claims was very large, each took the position that they were

17   subject to that settlement and that they thought the

18   settlement was reasonable and they weren't going to, you

19   know, back away from that.  So, it was the case that as of

20   this period, only Wilmington Trust was the only party

21   advocating vigorously for the retention of these claims for

22   future treatment under the plan.

23         So, if you look at slide 13, slide 13 just walks

24   you through, Your Honor, so you can easily find it in the

25   documents, walks you through the places where you can find

1  the brief.  So, for example, our brief analyzing the LBO that

2  was submitted to the examiner on May 24th.  6(a) of Exhibit N

3  is correspondence with the examiner in which the examiner

4  asked us to provide the equitable subordination complaint

5  that we had filed to him with the hyperlink to all of the

6  exhibits that are referred to in that complaint.

7       Exhibit 1(o) is work that was done by Mesirow

8  evaluating this economic impact and consequences of the LBO

9  transaction.

10       And Exhibit 1(p) is a compilation of positions

11 that were put forward by Wilmington Trust that were adopted

12 in the examiner's report.

13       That period of those briefings and the reply

14 briefings and the interaction with the examiner all took

15 place and extended through, basically, June, early July, and

16 the examiner ultimately renders his opinion on July 26th.

17 All along that period, the debtor is still pushing forward

18 with its first plan and other discovery is happening, other

19 document review, all the kinds of things that go on in the

20 case are continuing to happen.

21       So, debtors' exclusivity ends on October 8th.

22 After the hearing with Judge Carey, he then sends the parties

23 to mediation.  Judge Gross holds mediation hearings in

24 September and the first week of October.  The net result of

25 those hearings was that, once again, a settlement was reached

1  by essentially the same parties.

2          It was a settlement that was a better settlement

3  for the estate for sure.  It preserved in a liquidation

4  trust, certain of the claims against certain parties, but it

5  still resulted in the agreement to release the LBO creditors

6  who had put $10 billion of debt on this company and earned

7  their hundreds of millions of dollars of fees as they allowed

8  all that money to be, basically, taken out by the

9  shareholders.

10          The settlement value or contributions, you can

11  see, are listed above.  And these all, by the way, all these

12  facts were known in terms of, you know, what the LBO was all

13  along, this settlement here summarized in Judge Carey's

14  October 2011 decision in which he approved the settlement

15  under 9019 but denied confirmation for the competing plans.

16          But anyway, after the mediation by authorization

17  from the judge, Judge Carey, competing plans were now allowed

18  to be filed.  Originally, four competing plans were filed;

19  two were later withdrawn and then the competing plans went

20  down through the process until the confirmation hearing was

21  held in March of 2011 and then -- excuse me, I don't know if

22  it shows up on your screen, but somebody has popped up on my

23  screen that shouldn't be there; sorry about that, Your

24  Honor -- and, ultimately, that confirmation hearing was held

25  in March.

1          And then the judge does deny confirmation with his

2     decision in October of 2011, but he does approve the

3     settlement that had been reached at the close of the

4     mediation.  That then sent the parties off to a third

5     confirmation hearing that takes place ultimately in April and

6     a plan is finally confirmed in July.

7          So, that's sort of the background and the process.

8     And, of course, all along the way, it was a, you know,

9     obviously a very complex, difficult, and expensive case to

10    operate.  Okay.  So, that's just the background on that.

11    Hopefully, that is useful to put into context what the PHONES

12    thought and believed was possible, because it was absolutely

13    clear, the results were $8 billion worth of claims here.

14          The transaction, as I said, was notorious both,

15    before close and after, and while the claims had been

16    preserved now against the driving force shareholder Sam Zell

17    and other various parties, the claims were not ultimately

18    preserved against the LBO creditors.  But Wilmington Trust

19    didn't know that until the judge adopted that settlement and

20    approved that settlement in October of 2011.

21          Up until that point, Wilmington Trust had every

22    reason to believe that those claims could be put forward and

23    could result in value and value that would be realized by the

24    PHONES, whether it was through settlement or litigation.

25          So, anyway, okay.  So, let's now go, if you could,

1  to the next slide, Shari, which will get us back to the first

2  of our remand issues, which you asked a lot of questions

3  about earlier, Your Honor.

4              And since you've already gone through a lot of

5  this, I don't want to completely replicate what's already

6  been said, but we believe that the interpretation of the

7  words in 6.07 of "advance is incurred or made" does not mean

8  in the first instance that Wilmington Trust has to come out-

9  of-pocket on its own.  You've already touched on --

10             THE COURT:  Well, let me ask you a question --

11             MR. STOLL:  Yeah.

12             THE COURT:  -- because I don't think I really

13  argue with you about the idea whether you have to come out,

14  whether are Wilmington Trust might have to come out-of-

15  pocket, okay.

16             MR. STOLL:  Right.

17             THE COURT:  Because I don't think that, first of

18  all, as a practical matter, but second, just as a common

19  sense approach, I don't know that we would stand on ceremony

20  and say, Look, you know, debtor, Wilmington Trust, you need

21  to write a check for $25 million and then we, the debtor,

22  will be happy to pay you.  But if you don't pay that, you

23  know, then we're not going to reimburse you or if you don't

24  make that -- you know, the issue isn't so much whether

25  Wilmington Trust comes out-of-pocket, but whether, as I

1  understood Mr. Johnston's argument, whether Wilmington Trust

2  is responsible and has any obligation to reimburse.

3          MR. STOLL:  Right.

4          THE COURT:  And I'd like your thoughts on that.

5  You heard, obviously, the colloquy between me and

6  Mr. Johnston on it.

7          MR. STOLL:  Of course.  Yes, Your Honor.

8          So, let's do this in two ways.  Shari, can you go

9  to slide 22.

10          So, we cited to Your Honor in our brief, several

11  cases in which the issue of actually incurring or paying the

12  fee arises in a variety of contexts; some statutory, some

13  private contract.  And in situations in which fee shifting is

14  permitted, whether it's by statute or by indemnity agreement,

15  the courts have held over again that it is the existence of

16  the attorney-client relationship that allows for the party to

17  access that fee-shifting provision, and it does not depend on

18  whether the fees are actually paid in the first instance or

19  even obligated to be paid in the first instance by the client

20  because it's essentially, as you had noted, a past due.  It's

21  like a subrogation claim.

22          It's an indemnity claim and the entry into an

23  indenture with a trustee for the purposes of marketing bonds

24  always includes these indemnity provisions.  That's part of

25  what makes them marketable, and so people have that

1 | expectation.

2 | And the courts, in various situations, have found

3 | that it is just the existence of the attorney-client

4 | relationship that allows --

5 | THE COURT:  But is prevailing party, statutory

6 | structure, and contractual provisions really applicable in

7 | this situation?

8 | First of all, I'm not -- we can debate whether or

9 | not the PHONES noteholders were a prevailing party here, but,

10 | second, I guess I'm trying to wrap my head around the idea

11 | that a creditor or the agent of a creditor, could bind the

12 | estate to fees and costs that it will never be responsible

13 | for.

14 | And for example, you know, Mr. Johnston raised the

15 | issue with a charging lien, which I understand the mechanics

16 | of that, but here, arguably, say that there was a $10 million

17 | distribution to the trustee, to Wilmington Trust as -- under

18 | the indenture to be distributed to the noteholders, right.

19 | Now, theoretically there's a charging lien that

20 | could be imposed against that to pay for counsel, but

21 | actually, under the terms of the agreement, you folks,

22 | because Wilmington Trust and Brown Rudnick agreed that the

23 | debtor would be responsible, not for amounts that might be

24 | subject to distribution to noteholders and therefore subject

25 | to a charging lien, but the debtor would be responsible for

1  the higher amount.  So that, you know, even on a $10 million

2  distribution, you have agreed that the debtor would be

3  responsible for $30 million.

4          What am I missing?

5          MR. STOLL:  I don't think you're missing anything,

6  Your Honor.  But there are two points on that.  One is that

7  is the deal that the debtors struck with the indenture

8  trustee as part of the indenture.  It provided in a fee-

9  shifting clause that there are indemnity rights.

10          And so if we go back to slide 20 or 18, we have

11  the indemnity rights, the fee-shifting rights that are

12  enjoyed by the trustee, which was part of the *quid pro quo*

13  for that indenture being issued and selling those bonds into

14  the market, which, of course, the debtor enjoyed the benefit

15  of all of those hundreds of millions of dollars.  That's one.

16          Two, of course, there's always the assertion of

17  reasonableness, Your Honor, and the assessment of

18  reasonableness.  And so --

19          THE COURT:  Right.  And, obviously, we'll get to

20  reasonableness --

21          MR. STOLL:  Right.

22          THE COURT:  -- and I'm trying not to conflate the

23  two.  You're right, I mean, they do, as we talk through it,

24  they kind of come in, but I think the parties have been

25  pretty scrupulous about structuring the arguments and

1 separating those, and I think that that is the appropriate

2 way to proceed.

3         MR. STOLL:  And then the third point I would make,

4 Your Honor, is that although the ultimate, the fourth

5 iteration of the fee agreement did result in the higher

6 hourly rates or the 10 percent contingent fee, that is an

7 obligation of Wilmington Trust at the time that it was

8 entered into.  It's a contingent obligation, but it,

9 nonetheless, was an obligation.

10         We were supposed to try to do these fee analyses

11 or assessments without the benefit of hindsight, as hard as

12 that is to do and --

13         THE COURT:  Well, hang on.  Hang on.

14         Because I think Mr. Johnston made this point

15 directly, and it's in page 2 of his handout.  You know, when

16 you said that's an obligation of WTC in the modified fee

17 agreement, dated as of October 28, 2010, and it says Brown

18 Rudnick shall receive the higher of its fees and expenses or

19 10 percent of the recoveries; that's our comp, okay.

20         MR. STOLL:  Yep.

21         THE COURT:  But in the same agreement, it says you

22 are not on the hook for anything beyond what has already been

23 received and in hand, and, therefore, is it an obligation?

24         For example, I guess on this agreement, I

25 understand you're looking to the debtor for payment, but you

1  would not be able to turn to Wilmington Trust and say because

2  of everything we did and under our agreement, you owe me

3  $20 million or $30 million.  I read this to say that

4  Wilmington Trust would say, we're not obligated for anything

5  beyond what we provided.

6           Isn't that accurate?

7           MR. STOLL:  Yes, on the hourly fee portion.

8           But on the contingency portion --

9           THE COURT:  True.

10           MR. STOLL:  -- they would be obligated.

11           THE COURT:  Yes.

12           MR. STOLL:  And the point I'm trying to make is

13  that, again, if we can blinker ourselves away from hindsight,

14  at the time that this agreement is entered into, there is an

15  obligation of Wilmington Trust, contingent as it may be, and

16  if this fee application had not taken the detours, the fee

17  claim had not taken the detours that it had and it had been

18  resolved in 2013, it would have been resolved at a time

19  before anyone knew exactly how much would ultimately be

20  recovered in the trust.

21           I don't know if we actually know how much today.

22  I think we all know it's in the hundreds of millions of

23  dollars -- we don't know how many -- but it hasn't resulted

24  in a distribution to the, you know, PHONES noteholders.

25           But the "higher of" language would have meant

1    that, with respect to WTC's obligations to Brown Rudnick had

2    there been a distribution, first, whatever amount had been

3    paid by the debtor would have to be subtracted from that

4    because it couldn't have been paid twice.  But the point of

5    the agreement was to preserve Wilmington Trust's indemnity

6    rights and it's fee-shifting rights that it possesses under

7    the indenture so that if, as, and when there was a recovery,

8    it had the benefit of both, the contractual rights with the

9    debtor and its fee obligation with Brown Rudnick.

10                   THE COURT:  Okay.  I understand.

11                   MR. STOLL:  Okay.  And I won't go back over

12    Mr. Healy's comments about the (indiscernible).  I think you

13    understand those, and you've gone on through those.  So, I

14    think that's the end of that remand issue, one.

15                   If we can shift it remand issue two, so this is

16    the issue of was Wilmington Trust reasonable in its belief

17    that there was a potential recovery?

18                   And, again, I think the first thing to say is the

19    reasonableness -- this is, again, getting back to looking at

20    things in hindsight -- the reasonableness inquiry is:  Was it

21    reasonable for the PHONES -- for the Wilmington Trust to

22    believe that there would be or could be a recovery?

23                   And the reason I went through the earlier factual

24    background to remind Your Honor of this transaction is we

25    believe, and Wilmington Trust believes all along the way that

1  there was a very good likelihood.  That's why it fought for

2  the appointment of an examiner, for which it was awarded a

3  substantial contribution award.

4          That's why after the examiner issued his three-

5  volume report in which he went through the transactions and

6  laid, you know, all the defenses and broadcast across a range

7  of likely, highly likely, moderately likely, unlikely, the

8  various claims, and Wilmington Trust still believed that

9  there was a reasonable opportunity because the examiner found

10 that the second step of the transaction was highly likely to

11 be found to be a fraudulent transfer in that second step

12 which saw $4 billion of consideration go out to the settling

13 shareholders on top of the $4 billion that went out in the

14 first stage to the settling shareholders.  But that --

15          THE COURT:  Okay.  I understand that.

16          How do I deal with or I'd like your response to

17 the debtors' argument that we're not trying to do this by

18 hindsight.  I get it that there were litigation claims.

19          The debtors' point is that nobody disputes that

20 there were claims.  There were discussions, negotiations, and

21 a proposed settlement among some stakeholders -- not all --

22 at the outset.  So, there's no dispute that there were claims

23 and we can all sort of figure out that if those claims yield

24 a recovery to a certain amount, then there is an available

25 distribution.  And so I get that.  I understand that argument

1   and, again, I'm obliged to do so not with the benefit of

2   hindsight, but to do so sort of reasonableness at the time.

3   So I think I get that.

4           Mr. Johnston's argument, though, and the debtors'

5   argument was, among other things, would a client agree to pay

6   for the services at this scale for admittedly a prospect, but

7   an attenuated and remote and difficult prospect.  And am I

8   obliged -- I guess the question, more directly, would be:  Am

9   I obliged to find that a reasonable client would agree to pay

10  these, to sign up for this?

11          MR. STOLL:  Well, so, I think that, you know,

12  brings us back to how do you treat an indenture trustee's

13  rights and obligations to its constituency in the context of

14  this type of exercise?

15          So, nobody denies that the two noteholders who had

16  initially put up $3 million, stopped putting up money at that

17  point.  Of course, those two noteholders didn't control all

18  the bonds; they controlled approximately half the bonds.

19          It's a question, I think, of no small import.  I

20  don't think that it is unreasonable for you to find that a

21  trustee, an indenture trustee, understanding that it has the

22  right to seek indemnification and has the reasonable beliefs

23  that these claims can result in a return for its clients to,

24  put those two factors together and say, this exercise, even

25  if this money was not unreasonable.

1          Again, we're talking about huge numbers here and

2   it was -- and at some point, you could say, you know, enough

3   is enough, but it's not always enough is enough because the

4   $30 million wasn't incurred until the end.  So, at some point

5   along the process, you may say, you know, you should have

6   stopped there.

7          So, one thing we did in our brief, Your Honor, is

8   to try to landscape for you the case by periods of time so

9   that you could see sort of the fees across that period of

10  time.  So, I should have made this a slide.  I don't have

11  it --

12          THE COURT:  It is a slide.

13          MR. STOLL:  Oh.

14          THE COURT:  Yeah, I saw that at the outset.

15          MR. STOLL:  No, not that slide.  I'm

16  (indiscernible) a different one.

17          But if you, when you go back and you think about

18  this, if you look at Exhibit 6(a)(1) which is, again, the

19  draft brief that we delivered to the reorganized debtor when

20  we initially began the stipulated claims process, on page 20

21  we landscape the fees that were incurred by the collective

22  professionals bar charted so that you could see at what point

23  in time, you know, the fees were incurred.  And I think

24  that's a helpful framework to say, okay, if I think at this

25  point, at the point of the examiner, that's reasonable,

1  that's one place to look at it.  After the examiner's report,

2  the mediation, that's another way to look at it.  After the

3  mediation, the competing plans is another way to look at it.

4          And so, at some point you may determine in your

5  assessment of reasonableness that Wilmington Trust should

6  have given up the ghost because it was making no headway with

7  the parties and it how had claims that were going to be

8  preserved, but that's the most that it could accomplish.  You

9  may make that determination faster or earlier than we made

10 it, as the client and the law firm.  But I think that's a

11 useful barometer to think about.

12          THE COURT:  All right.  I think that's helpful.

13          Then let me kind of turn the point that I went

14 back and forth with Mr. Johnston on about, it kind of

15 involves now, reasonableness.  We're mixing up or combining

16 reasonableness and the gating question of who's responsible

17 and who signed on.

18          You heard the concerns that I expressed to

19 Mr. Johnston about whether or not if I buy their argument

20 that somebody actually has to be on the hook, then perhaps

21 I'm changing or complicating existing practice and

22 relationships, and I think I understood his argument on that.

23          But if your argument is correct, part of the

24 concern I have is that every case presents a situation where

25 there's the prospect of a litigation homerun.  Not every case

1  has an $8 billion, you know, LBO potential recovery, et

2  cetera.

3  But we've got equity or deeply out-of-the-money

4  subordinated debt, you know, third lien, mezzanine guys and

5  they -- every able lawyer can say, you know something, we've

6  got fraudulent conveyances or we've got a great big D&O

7  coverage or there's, you know, we can sue the hedge fund for,

8  you know, that was pulling all the strings and that's how

9  we're going to get our recovery or, you know, we'll come up

10  with a claim or a lawsuit and since there is no meaningful

11  prospect to us right now on any of the economic transactions

12  that are out there, we are going to the mattresses.  You

13  know, we are going to go to war over this because we have no

14  reason not to.

15  Now, I admit those are not your facts.  The LBO

16  issues were out there for everybody to see and you're right,

17  the numbers were staggering.  But where's the limiting

18  principle where, in the next -- again, in the next oil-and-

19  gas case that I have, I've got a whole bunch of equity behind

20  a mountain of debt and they want to recharacterize it and

21  everything else and their point is going to be, now, equity

22  might not be the best example because they're not going to

23  have the indenture rights, but, fine, you know, deeply

24  subordinated, convertible obligations, something like that,

25  what's the indenture language?

1           You know, I don't think the debtor and, you know,

2  in normal situations, assumes that in that position, they are

3  on the hook for the other side's attorney's fees, and so I'd

4  like your thoughts on that.  What's the limiting principle?

5           MR. STOLL:  I think that's a great question, Your

6  Honor.

7           So, the way I look at it is this.  First of all,

8  it's, obviously, going to be a very fact-specific situation.

9  It can't be a universal pool.  I would submit to you in a

10  case like this where the debtor engages in a transaction of

11  this magnitude, that clearly -- that ends up in the eyes of

12  an examiner, in the eyes of the noteholder, a committee, a

13  massive fraud that takes it from a fully protected creditor

14  in the sense of the equity of the company, to deeply and an

15  out-of-the-money subordinated creditor.

16           That fraud that they willingly participated in is

17  ample reason for them to have to run the risk that they're,

18  in fact, going to be on the hook for fees that they've

19  otherwise contractually agreed to be on the hook for.

20           Because it can't be the case that they can act

21  with impunity and, you know, they sold these bonds in the

22  market.  They got the, you know, originally, the billion

23  dollars that they got by selling these into the market with

24  this promise.  And then they turn around and commit a fraud

25  on the magnitude of $8 billion and they want to say, oh, now

1  you can't sue us because you're not, you know, paying the fee

2  yourself.

3          I don't think that is a hard stretch, but I do

4  think it is unique to these facts and would not necessarily

5  be applicable to the next case.

6          THE COURT:  Okay.  I think you've answered it for

7  me.

8          MR. STOLL:  So the next thing is the fees

9  themselves.  And we, as I said before, obviously, the case

10  was, you know, of enormous size, and so the fees are

11  enormous.  They may pay out, compared to everybody else's

12  fees, but nonetheless, they are big.  And so I wanted to just

13  touch on a few of the things that I think are helpful for

14  Your Honor in evaluating what to do.

15          Obviously, Your Honor has discretion to adjust any

16  fee application or any -- allow any claim like this that is

17  based largely on professional fees, as you deem appropriate.

18  We've cited you a lot of cases from a lot of different

19  contexts in which the courts use a percentage approach,

20  because in voluminous cases, you know, where the time sheets

21  are voluminous, even if you put aside, you know, they're

22  pristinely dotted and segregated, if it's voluminous, it's

23  not an efficient way for the Court to operate and so a little

24  bit of rough justice does, in fact, have to be used.

25          And the idea is to make sure that there's not

1  unnecessary duplication and wasted effort and that kind of

2  thing.  And so, you know, as we look at the case law, we

3  thought that case law seemed to routinely come up with a 10

4  to 25 percent range of what is usually used, but that's, I

5  think, just a rule of thumb.  I think Your Honor is perfectly

6  within his rights to use any amount that he thinks is

7  appropriate.

8         In fact, the debtors, if you look at what they

9  have said should be the percentage reduction, but they

10  approach it the same way, if, as, and if you get beyond their

11  base $3 million case, they, basically, use 85 percent as to

12  every entry of time that they decided to block out of and

13  characterize.  So, they reduced everything by 85 percent,

14  which gets them from our $30 million-dollar claim down to

15  what they say should be allowable, at best, if you ignore the

16  $3 million issue of $5 million.

17         And so, for example, to apply that to Brown

18  Rudnick, if they did that, if you give that 85 percent, that

19  would reduce a $21 million claim down to a $3 million claim,

20  coincidentally, the same as the $3 million that were paid by

21  the bondholders.

22         But, to put that in context of what that would

23  mean to Brown Rudnick's representation of WTC during the

24  course of the case, the case lasted from December of 2018 to

25  December of 2012 -- four years [sic].  So that would mean,

1    essentially, $750,000 a year of fees or about $60,000 a

2    month, which would put Brown Rudnick, on behalf of Wilmington

3    Trust, in an advisory context only; basically, the exact

4    position that the debtors said they always wanted us in.

5    They did not want us to participate in an active way and I

6    think it was not helpful and useful, despite the fact that

7    it's undisputed that Brown Rudnick was the driving force in

8    the appointment of the examiner and that that appointment and

9    that process led to a better outcome for the estate, at

10   least, even if not for Wilmington Trust.

11          So, again, the debtors also go through several

12   (indiscernible) of our various positions that Brown Rudnick

13   took in the case, various activities.  Again, I put that in

14   the category of, and, you know, at some point, you may say

15   you should have stopped certain activities, but they,

16   nonetheless, come up and we essentially reduced everything by

17   85 percent.  Those have been briefed.  I don't think we need

18   to go through them here.

19          THE COURT:  Right.

20          MR. STOLL:  Then there's the Mesirow issue.  So,

21   yes, the Mesirow issue did morph, did change, but at least in

22   response to the question about no time sheets for the time

23   after August, the reason that sort of ended up in that place

24   in terms of the fee application was that if you look at

25   Tab 6(d), you'll see the Novod declaration and at

1  paragraphs 11, 12, Mr. Novod, who was the lawyer who was

2  involved in the bankruptcy case in negotiating these things

3  at the time, one goes through the entire list of all of the

4  estate professionals -- not the estate professionals -- of

5  the professionals for the various creditors, the LBO

6  creditors, and their financial advisors who were paid with

7  similar superficial detail.  So, that's how that ended up

8  that way.

9          And they were -- you know, these financial -- you

10 know financial advisors are not typically timekeepers; they

11 usually work on flat fees or that kind of thing.  So, that's

12 not terribly remarkable.

13         The issue, though, on whether Wilmington Trust

14 should share it all, so in the competing plan process,

15 Wilmington Trust and Deutsche Bank, Law Debenture, Aurelius

16 collectively put forward that competing plan and that's what

17 was retained collectively.  And even though Aurelius fronted

18 the money, the engagement letter provides that the indenture

19 trustees will use their best efforts to collect those amounts

20 under their indemnity rights under the indenture.

21         And you can see that at Section 6 of the December

22 2010 Mesirow indenture on the engagement letter, which just

23 again for your reference, has a Bates number of WTC1F06144.

24         And, again, you know, whether that, because the

25 competing plan was not successful, whether that causes Your

1   Honor to feel that that (indiscernible) --

2           THE COURT:  Let's take a step back, though, on the

3   Aurelius Mesirow issue --

4           MR. STOLL:  Yes.

5           THE COURT:  -- and I think Mr. Johnston pointed

6   this out in his argument, Mesirow represented Aurelius.  It

7   wasn't Aurelius --

8           MR. STOLL:  It --

9           THE COURT:  Go ahead.

10          MR. STOLL:  No, they were retained by the lawyers

11  for -- and Aurelius made the payment.

12          THE COURT:  Okay.

13          MR. STOLL:  So, then, the last point, Your Honor,

14  goes back to the issue of fees incurred in collecting fees,

15  where it ends up being a litigation dispute.  So, the way I

16  looked at it, the way we look at it is that it's the fee

17  right under the indemnity provisions of the indenture

18  provides (indiscernible) the indenture's evidence, their

19  contingent rights, and those are the cases that I just cited,

20  that manufacture (indiscernible) Ann Arbor Trust, we cite to

21  you here.  In the brief, we cited Ogo (phonetic), the Second

22  Circuit case, and SMTL, the cases that came after the

23  Travelers decision of 2007 by the Supreme Court, which dealt

24  with the issue of whether attorney's fees were allowed as

25  unsecured claims under 502(b).

1          Those cases all say that the rights under an

2    indenture to have your fee rights, under a fee-shifting

3    clause arise when the indenture is entered into.  And they

4    spring, of course, when the fees are incurred, which may

5    incur after bankruptcy, but that does not mean that they're

6    not recoverable.

7          Even though we told you in our opening filing that

8    you didn't have to go back and read those pages of our

9    original brief dealing with the 502, 506(b) argument, if you

10   do go back and take a look at those 10 pages, it's in

11   there --

12          THE COURT:  Okay.

13          MR. STOLL:  -- on a contingent agreement argument.

14          And then Judge Gross ruled, as you know, or see,

15   at least from our cite, in Nortel that where an indenture

16   requires an entity to indemnify the trustee and then they'll

17   fight about that, those fees are recoverable.  But that

18   happened to be a fight between one of the noteholders and the

19   trustee, but I think the principle still applies that if the

20   indemnity is part -- rights are under the indenture and those

21   spring and then you have a fight over that, then you're

22   entitled to recover those fees, again, to the extent that

23   Your Honor feels they're reasonable and in the scope of both,

24   the fees themselves on that part of the recovery, as well as

25   whatever else is awarded for the claim, itself.

1        And so, that's all I have, Your Honor.  If there
2  are any further questions, I'm happy to take them now.
3        THE COURT:  Yeah.  I'd like to get your answer,
4  and it's kind of a softball, but I'd like your thoughts on
5  it, again, because on the gating question about how the
6  relation to the economic or practical relationship between an
7  indenture trustee and a counsel in a bankruptcy case works.
8  You heard the discussion that I had with Mr. Johnston and I
9  think you answered it, but, you know, the question I asked
10 Mr. Johnston pretty directly is, regardless of this
11 particular case, if I were to find that the indenture trustee
12 or the noteholders themselves must be, you know, first in
13 line, obliged to pay these obligations, does that change how
14 business is done in the bankruptcy courts?
15       MR. STOLL:  Well, I think it does because I think
16 what happens is unless the indenture trustee can rustle up
17 enough noteholders who are willing to fund the case, that in
18 a bankruptcy is always uncertain in length and expense to all
19 the other parties involved, then any indenture trustee who
20 has any question or any set of noteholders who have any
21 question about whether they are for sure going to get paid
22 anything and how much, will automatically stand-down.
23 They'll just have to stand-down because no one is going to
24 take that risk unless there is some really, you know,
25 enticing reason to do so.  So, I think that's

1  (indiscernible).

2          THE COURT:  Well, actually, you just used the

3  phrase "take the risk," and I think, again, from

4  Mr. Johnston's arguments earlier on, his point was that at

5  least when the fee arrangement changed for Brown Rudnick, I

6  think what he said was, look, they were taking the risk that

7  there would be a recovery against which they could get paid.

8          MR. STOLL:  I think they have to.  We were taking

9  the risk of a contingency from a recovery, but we were also

10  relying on the indenture trustee's rights for indemnity under

11  its indenture in a situation on which those rights arise

12  because of a massive fraud engaged in by, willingly engaged

13  in by the debtor.

14          So, I think, again, it has to be specific.  I know

15  you don't want to make any bad precedent --

16          THE COURT:  No.

17          MR. STOLL:  -- that someone is going to -- and I

18  know it's hard to cabin these things once they're out into

19  the ether, but I think it's hard to take this out of the

20  context of this massive fraud that, again, the debtor was

21  the, you know, perpetrator of.  So, in that context, I think

22  if in those situations you say that unless you have a fully

23  funded case, you know, where you have an array of banks who

24  are also, at least at the time, believed to be participants

25  in the fraud, all lawyered up with, you know, the most

1  expensive folks they can find, you know, you're determining

2  the fate of most types of indenture trustees and their

3  constituents.

4        THE COURT:  Okay.  I think you've answered my

5  question.

6        Mr. Johnston, are you okay for a brief reply or do

7  we need to take a break?

8        MR. JOHNSTON:  Your Honor, I'm fine for a brief

9  reply and I will keep it as brief as I can be.

10        THE COURT:  Okay.  That would be great.  You may

11  proceed.

12        MR. JOHNSTON:  Okay.  Thanks, Your Honor.

13        And I'll start with where Mr. Stoll ended, because

14  his answer to your question was revealing.  He said something

15  to the effect of, well, Brown Rudnick took the risk as to the

16  contingency fee, but not as to its hourly fee, and remember,

17  these are full, hourly fees, not discounted.  And I think

18  that that proves too much.

19        Your Honor, as a remedy, in principle, you

20  suggested something like, would a reasonable client sign up

21  to this?

22        I think that is a very good way to put it, and the

23  answer is no reasonable client would have signed up to a fee

24  arrangement where there was a contingency fee or a full

25  hourly fee.

1          Mr. Stoll talked a lot about the reasonableness of

2   the efforts at the time that the services were rendered.  Who

3   better to know where to draw the line than the actual holders

4   of the PHONES notes?

5          At the time, as they were living the case, those

6   holders drew the line at $3 million.  I think that is a

7   compelling fact.

8          THE COURT:  So, let me ask you, and I don't want

9   to beat a dead horse, but we just had this discussion.  You

10  know, it's, again, it's not my understanding that when your

11  firm is hired by an indenture trustee to represent the

12  seconds or to represent whoever, you know, I know the

13  indenture trustee doesn't say, you know, I, as indenture

14  trustee will be happy to write a check to you regardless of

15  what happens here.

16         And so, I'm kind of looking for, look, I share the

17  anomaly or the gestalt view that you're having to this, so

18  it's how can we be on the hook for $30 million for work that,

19  one, was not an actual obligation of the indenture trustee,

20  and, two, which resulted in no recoveries.  So, I understand

21  that kind of overarching argument, but I've got a more

22  specific question, which is, if I say you're right and I say,

23  you know something, if you're on -- if you want to get paid,

24  your indemnity will be limited to the amounts or the debtors'

25  indemnity obligations will be limited to committed amounts by

1 either the noteholders or the indenture trustee.

2          That's not existing practice, right?

3          MR. JOHNSTON:  No.  But, Your Honor, you left one

4 critical fact out, which is that the indenture, like every

5 other indenture, provides for payment from a charging lien.

6 It provides for payments from distributions on the notes.

7 So, to the extent that a professional representing a

8 subordinated constituency wants to take a risk, realize that

9 no holder out there is willing to fund these efforts, but the

10 professional likes the efforts, the professional can rely on

11 the charging lien, which is exactly what the professionals

12 did here once the unsecured noteholders cut off the funding.

13          They said, well, okay, Brown Rudnick said we'll

14 get a contingency fee, but at the end of the day, if there

15 are distributions on these PHONES notes, Wilmington Trust

16 will exercise the charging lien and will get paid.

17          The problems for the professionals here is that

18 there were no distributions on the charging lien.

19          THE COURT:  So, your point would be, there is

20 nothing unusual here.  When somebody comes in to represent an

21 indenture trustee, the indenture trustee says, I want to be

22 clear, I'm not personally responsible for this, but you're

23 going to do the work and if we get a recovery, you'll be

24 entitled to payment out of it or if I pay you and I can get

25 reimbursed, or we can get the debtor to do it.

1        But your point is this is not an unusual or a non-

2   market result.  The only result here is that there was no

3   recovery.  So, this is the same.  It's a straight-up

4   contingency.  I'll represent you in your car accident and if

5   we recover from the other driver, then I'll get paid, and if

6   I don't, I don't.  I understand that.

7        MR. JOHNSTON:  That's precisely my point.  This is

8   not an unusual case.  The only thing unusual is that there

9   were no distributions on these notes, so there was nothing to

10  enforce the charging lien against.

11       THE COURT:  Okay.

12       MR. JOHNSTON:  Your Honor, what Mr. Stoll spent a

13  lot of time talking about Wilmington Trust's efforts with the

14  examiner and leading up to the examiner in the case, I would

15  note a couple things.  One, Wilmington Trust's efforts were

16  not unique.  There was extensive briefing to the examiner,

17  but in addition to Wilmington Trust, the debtors submitted

18  briefs; the committee submitted briefs; JP Morgan, as agent

19  to the credit agreement, submitted briefs; the credit

20  agreement lenders themselves submitted briefs; the senior

21  notes indenture trustee submitted briefs; and Aurelius

22  submitted briefs, and I probably forgot a few.

23       So, to hold Wilmington Trust out as the white

24  knight pursuing these claims or arguing these claims, it's

25  false.

1          I would also note Mr. Stoll proceeded on the

2    assumption that there was a massive fraud.  I think he used

3    that term multiple times by Tribune and even said there was a

4    finding of massive fraud by the examiner.

5          The examiner did not find the massive fraud and

6    the fact of the matter is, neither have the courts.  And

7    every single one of these LBO claims that weren't settled

8    have now been dismissed.  So, we can't proceed on the

9    assumption that Wilmington Trust uncovered a massive fraud

10   that was later validated.

11         I think part of the purpose of the discussion of

12   all of Wilmington Trust's efforts was that they improved the

13   results for the estate.  And if you look at their slide 16,

14   they said Wilmington Trust's efforts improved settlement

15   terms for non-LBO lenders.

16         Well, Your Honor, there's a mechanism under the

17   Bankruptcy Code for creditors who actually have a

18   contribution to the estate.  It's the substantial

19   contribution mechanism.

20         Wilmington Trust submitted a $7.1 million-dollar

21   substantial contribution claim and, Judge Farnan recommended

22   that it be reduced to $496,000, which Wilmington Trust

23   ultimately accepted.  So, whatever benefit Wilmington Trust

24   achieved for other creditors, it's been compensated for.

25         Mesirow, Your Honor, briefly.  Mr. Stoll conceded,

1    there are no time records beyond August 2010 for Mesirow.  It

2    is also a fact that Mesirow was not working under an

3    engagement fee.  This was not a transaction-fee basis.

4            Mesirow has billed hourly fees and Wilmington

5    Trust has asserted a claim for Mesirow's hourly fees.  I

6    don't understand how it's possible that you could rule that

7    upwards of $5 million of Mesirow's hourly fees are reasonable

8    without seeing a single time record.

9            Mr. Stoll mentioned that Aurelius had agreed to

10   pay these fees, but he omitted the critical fact that I tried

11   to drive home, which is not only did Aurelius agree to pay

12   these fees under the December 2010 agreement, Aurelius had

13   the right to direct Mesirow's conduct in the case.

14           Brown Rudnick and Wilmington Trust did not, and

15   the engagement agreement specifically provides for that.

16           At the beginning, Mr. Stoll said, whatever happens

17   here, whatever claim is allowed, Your Honor should not deduct

18   what Tribune has already paid in respect of these claims.

19           That's not correct, Your Honor.  As we went

20   through, Section 6.07 of the (indiscernible) indenture

21   provides for Tribune's reimbursement -- it tries for amounts

22   it actually -- liabilities it actually incurred.

23           Tribune's plan provided that Tribune would

24   reimburse members of the official committee for "amounts

25   incurred by individual members of the creditors' committee in

1  their capacity as members of the creditors' committee."

2  That's Section 1.1.52 of the plan.

3          Here, Tribune paid -- here, Tribune allowed

4  claims -- excuse me -- Wilmington Trust's allowed claim,

5  whatever it is, it's going to be for amounts incurred,

6  liabilities incurred by Wilmington Trust.  Under that plan

7  provision, Tribune has already paid some of those liabilities

8  incurred and there has to be a deduction, or else, it would

9  be double-counting.

10          The same thing with respect to the substantial

11  contribution payment.  In Section 503(b)(3) of the Code

12  provides that after a substantial contribution is proven, the

13  debtor will "reimburse fees and expenses incurred by" the

14  creditor making the contribution.

15          Here, again, Tribune has made a payment in respect

16  of fees incurred by Wilmington Trust.  That is the genesis of

17  whatever unsecured claim is ultimately allowed and there

18  should be a deduction.

19          Two other points, Your Honor.  Mr. Stoll cited to

20  you some cases that, where he said that there doesn't have to

21  be a claimant liability for a fee in order for a party to be

22  responsible for reimbursing or paying those fees.  That was

23  on Slide 22.

24          If I'm not mistaken, every single one of the cases

25  on slide 22 that's been cited to Your Honor are fee-shifting

1  prevailing party cases.

2          That's not this case.  Obviously, Wilmington Trust

3  didn't prevail at anything, but this isn't a statutory fee-

4  shifting case; this is a contract case.  And the contract

5  requires a liability incurred for something to be reimbursed

6  before there is any obligation in respect of Tribune.  That

7  didn't happen here.

8          And the last point, Your Honor, with respect to

9  the million dollars in fees after the effective date of

10  Tribune's plan, the argument here is by operation of the plan

11  and the Bankruptcy Code's discharge, the plan provided for

12  any liabilities to be cut off on the effective date.

13          Those were not the facts in Nortel.  Nortel was

14  not a discharge case.  It was not a plan-interpretation case.

15          And what we have here, you know, it's simply, you

16  know, just straightforward application of the claim.

17          THE COURT:  All right.  I really do appreciate the

18  argument.  Obviously, as I think both sides noted, it's not

19  ideal to have this with Judge Carey, and were it an option, I

20  would give it to him in a heartbeat, but here I stand.

21          And the argument actually was helpful all around

22  because while I felt that I had a pretty good handle on the

23  timeline and the events of the case, hearing it, basically,

24  directly from you folks certainly gave me a lot more context.

25          I don't have any further questions for the

1  parties.  If I do, you can expect that I will get in touch

2  with you, but I think that the matter is fully briefed and

3  submitted.

4          I realize that this has been out there for just

5  short of forever, so I do want to make this a priority in

6  order to get to it, so I do expect to rule promptly.

7          But this has been very helpful, and as I said at

8  the outset, I think the briefing was excellent and the

9  argument was predictably excellent, as well.

10          Are there any questions before we adjourn?

11          UNIDENTIFIED:  Not from us, Your Honor.

12          THE COURT:  All right.  Well, thanks, everybody.

13  I appreciate it and we are adjourned.

14          Be well.

15          COUNSEL:  Thank you, Your Honor.

16      (Proceedings concluded at 12:31 p.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

/s/ William J. Garling                    March 12, 2021

William J. Garling, CET**D-543

Certified Court Transcriptionist

For Reliable